RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0312p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

SHIRLEY L. PHELPS-ROPER,

        *Plaintiff-Appellant,*

    *v.*

TED STRICKLAND; MARC DANN; WILLIAM MASON,
        *Defendants-Appellees.*

No. 07-3600

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-02038—Donald C. Nugent, District Judge.

Argued: February 5, 2008

Decided and Filed: August 22, 2008

Before: SUHRHEINRICH, COLE, and GIBBONS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Jeffrey M. Gamso, AMERICAN CIVIL LIBERTIES UNION OF OHIO, Cleveland, Ohio, for Appellant. Peggy W. Corn, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, Frederick W. Whatley, CUYAHOGA COUNTY PROSECUTOR'S OFFICE, Cleveland, Ohio, for Appellees. **ON BRIEF:** Jeffrey M. Gamso, Carrie L. Davis, AMERICAN CIVIL LIBERTIES UNION OF OHIO, Cleveland, Ohio, for Appellant. Frederick W. Whatley, David G. Lambert, CUYAHOGA COUNTY PROSECUTOR'S OFFICE, Cleveland, Ohio, Julie Kelley Cannatti, Cleveland, Ohio, for Appellees.

———————————

## OPINION

———————————

    SUHRHEINRICH, Circuit Judge. This case involves a facial challenge to a provision of Ohio Rev. Code § 3767.30 ("Funeral Protest Provision"), which prohibits "picketing" or "other protest activities," within 300 feet of the funeral or burial service, from one hour before until one hour after the funeral or burial service. We hold that the Funeral Protest Provision is a reasonable, content-neutral regulation of the time, place, and manner of speech.

# I.  BACKGROUND

## A.  Ohio Rev. Code § 3767.30

Since 1957, Ohio has regulated the picketing of both funerals and funeral processions.  The statute, first amended in 1961, prohibited the picketing of a funeral or burial service, from one hour before through the duration of the funeral or burial service, and did not define a geographic area within which its restrictions applied.  *See* Ohio Rev. Code Ann. § 3767.30 (West 1961).  Section 3767.30 also separately prohibited the picketing of funeral processions.  *Id.*

On May 25, 2006, the Ohio legislature further amended § 3767.30.  The amendment made three major changes.  First, the amendment extended the time within which the statute applies, from one hour before until one hour after a funeral or burial service.  Ohio Rev. Code Ann. § 3767.30 (West 2006).  Second, the amendment defined a specific boundary within which the statute applies, 300 feet.  *Id.*  And third, the amendment expanded the definition of protest to "other protest activities" that disrupt or disturb a funeral, burial service, or funeral procession.  *Id.*  Thus, § 3767.30 now provides:

> Every citizen may freely speak, write, and publish the person's sentiments on all subjects, being responsible for the abuse of the right, but no person shall picket or engage in other protest activities, nor shall any association or corporation cause picketing or other protest activities to occur, within three hundred feet of any residence, cemetery, funeral home, church, synagogue, or other establishment during or within one hour before or one hour after the conducting of an actual funeral or burial service at that place. . . .

> As used in this section, "other protest activities" means any action that is disruptive or undertaken to disrupt or disturb a funeral or burial service or a funeral procession.

Section 3767.30 also retained the provision restricting protest activities around a funeral procession ("Funeral Procession Provision"), and similarly set a 300-foot boundary.  The Funeral Procession Provision now provides: "No person shall picket or engage in other protest activities, nor shall any association or corporation cause picketing or other protest activities to occur, within three hundred feet of any funeral procession."

A person convicted of violating § 3767.30 is guilty of a third-degree misdemeanor, § 3767.99(C), and an association that violates § 3767.30 is guilty of a fourth-degree misdemeanor. § 3767.99(B).

## B.  Factual Background

Plaintiff-Appellant, Shirley Phelps-Roper ("Phelps-Roper") is a member of the Topeka, Kansas-based Westboro Baptist Church.  According to her complaint, members of this congregation, "including [Phelps-Roper], believe that homosexuality is a sin and abomination. They further believe that God is punishing America for the sin of homosexuality by killing Americans, including soldiers.  Because God is omnipotent to cause or prevent tragedy, they believe that when tragedy strikes it is indicative of God's wrath."

Phelps-Roper claims that she and other members of her church have picketed at funerals of American soldiers killed in Afghanistan and Iraq because of their belief that protesting at funerals is an effective way to convey the message of their church.  At these funerals, Phelps-Roper and members of her church have displayed signs containing such messages as "Thank God for IEDs," "God Hates Fags," "Thank God for Dead Soldiers," and "Thank God for 9/11."  Phelps-Roper

contends that she "wishes to protest in the future at funerals in Ohio, and specifically within the environs of Cuyahoga County," but that she "fears being prosecuted for violating § 3767.30." She claims to have once participated in a funeral protest in Ohio, on January 27, 2006.

### C. Procedural History

On August 24, 2006, Phelps-Roper brought this § 1983 action challenging the constitutionality of § 3767.30, both the Funeral Procession Provision and the Funeral Protest Provision. In Count I of her complaint, she alleged that these provisions are overbroad in their time, place, and manner regulations of speech, because they are not narrowly tailored to serve a significant governmental interest and do not leave open alternative channels for communication. In Count II of the complaint, she alleged that the provisions are an overbroad criminalization of speech, because they impose unreasonable time and space restrictions on speech. Phelps-Roper named as defendants the Governor of Ohio, the Attorney General of Ohio, and the Cuyahoga County, Ohio Prosecutor (collectively "Respondents"), in their official capacities. Phelps-Roper requested a declaratory judgment and injunctive relief enjoining Respondents from enforcement of § 3767.30. Along with her complaint, Phelps-Roper filed a motion for a preliminary injunction to enjoin enforcement of § 3767.30.

The parties agreed to limited discovery and then filed cross-motions for summary judgment. The record before the district court consisted of Phelps-Roper's stipulation to the authenticity and admissibility of the contents of the Westboro Baptist Church's web sites, her responses to Respondents' discovery requests, and the affidavit of Roger Primm, a long-time funeral director in Ashland, Ohio.

The district court found the Funeral Procession Provision to be unconstitutionally overbroad. *Phelps-Roper v. Taft,* 523 F. Supp. 2d 612, 620 (N.D. Ohio 2007). The district court determined that the Funeral Procession Provision created a "floating buffer zone," and reasoned that "because the buffer zone 'floats,' the overbreadth is not only real, but substantial, when viewed in relation to the statute's legitimate sweep." *Id.* 620. The district court therefore granted summary judgment in favor of Phelps-Roper as to this portion of the decision. The district court ordered severance of the Funeral Procession Provision from § 3767.30, "the portion of [] § 3767.30 that states, 'No person shall picket or engage in other protest activities, nor shall any association or corporation cause picketing or other protest activities to occur, within three hundred feet of any funeral procession,' as well as the reference to the funeral procession in the statute's definition of 'other protest activities.'" *Id.* at 620. Respondents do not cross-appeal this ruling.

The district court found the Funeral Protest Provision constitutional as a content-neutral regulation of the time and place of protests coinciding with these services. *Id.* at 620. The district court applied the intermediate scrutiny test for a content-neutral time, place, and manner regulation, finding that: (1) the State of Ohio has a significant interest in protecting its citizens from disruption during events associated with a funeral or burial service; (2) Phelps-Roper failed to demonstrate that the statute's purported overbreadth is either real or substantial; and (3) the Funeral Protest Provision provides Phelps-Roper with alternative means to communicate her message. *Id.* at 618-20. The district court therefore granted summary judgment for Respondents as to the Funeral Protest Provision. Phelps-Roper appeals this ruling.

### II. ANALYSIS

The district court's grant of summary judgment is reviewed de novo. *Lukowski v. CSX Transp., Inc.*, 416 F.3d 478, 482 (6th Cir. 2005). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and an affidavit show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c).

### A.  The Funeral Protest Provision is Reasonable as a Content-Neutral Regulation of the Time, Place, and Manner of Speech

Phelps-Roper contends that the Funeral Protest Provision violates the First Amendment as an overbroad regulation of the time, place, and manner of speech. The First Amendment is implicated because picketing, included in the list of protest activities restricted by § 3767.30, is inherently "expressive activit[y] involving 'speech' protected by the First Amendment." *United States v. Grace*, 461 U.S. 171, 176 (1983). The statute also regulates speech in public fora, as both streets and sidewalks, upon which Phelps-Roper desires to protest, are generally considered traditional public fora. *See, e.g., Frisby v. Schultz*, 487 U.S. 474, 481 (1988) ("[A]ll public streets are held in the public trust and are properly considered traditional public fora.").

The overbreadth doctrine provides that the government may not proscribe a "substantial" amount of constitutionally protected speech judged in relation to the statute's plainly legitimate sweep. *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003). "Facial overbreadth claims have [] been entertained where statutes, by their terms, purport to regulate the time, place, and manner of expressive or communicative conduct . . . ." *Broadrick v. Oklahoma*, 413 U.S. 601, 612-13 (1973) (listing cases); *cf. Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 967 n.13 (1984) ("'Overbreadth' has also been used to describe a challenge to a statute that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest.")

The Supreme Court has stated that "[i]nvalidation for overbreadth is strong medicine that is not to be casually employed." *United States v. Williams*, 128 S. Ct. 1830, 1838 (2008) (citation and quotation marks omitted). The Court recently observed that facial challenges are disfavored for three reasons. First, "[c]laims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records." *Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184, 1191 (citation and quotation marks omitted). Second, facial challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (citation and quotation marks omitted). Third, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.*

The district court held, based on the parties' stipulations, that § 3767.30 is content-neutral. *Phelps-Roper,* 523 F. Supp. 2d at 618. We agree that the statute is content-neutral. *Cf. Hill v. Colorado*, 530 U.S. 703, 719 (2000) (noting that it is "appropriate to comment on the 'content neutrality' of the statute" because the lower courts concluded that it was a "content-neutral time, place, and manner regulation"). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citation omitted). Section 3767.30 is content-neutral first because the statute "is not a regulation of speech," but rather "a regulation of the places where some speech may occur." *See Hill*, 530 U.S. at 719 (internal quotation marks omitted). Second, § 3767.30 "was not adopted because of disagreement with the message [the speech] conveys," because the restrictions of § 3767.30 "apply equally to all demonstrators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech." *See id.* (internal quotation marks omitted). And third, the State of Ohio's asserted purpose for the statute, the

protection of its citizens from disruption during events associated with a funeral or burial service, is "unrelated to the content of [a funeral protestor's] speech." *See id*. at 719-20.

Because § 3767.30 is content-neutral, the appropriate test is intermediate scrutiny. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *Grider v. Abramson*, 180 F.3d 739, 748-49 (6th Cir. 1999). Under this test, the government may impose reasonable content-neutral restrictions on the time, place, or manner of protected speech, provided the restrictions: (1) "serve a significant governmental interest;" (2) are "narrowly tailored;" and (3) "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (quotation marks and citation omitted).

For the following reasons, we hold that the Funeral Protest Provision satisfies the three-part inquiry in *Ward*, and is therefore constitutional.

### B.  The Funeral Protest Provision Serves an Important Governmental Interest

The district court found that § 3767.30 served a significant governmental interest, namely to protect the citizens of Ohio from disruption during the events associated with a funeral or burial service. *Phelps-Roper*, 523 F. Supp. 2d at 618-19. The district court determined that the existence of a significant governmental interest was dependent on whether the funeral attendees are a "captive audience" to communication that "is so intrusive that [the] unwilling audience cannot avoid it." *Id*. at 618 (citing *Frisby*, 487 U.S. at 474). The district court reasoned that funeral attendees are a "captive audience"that cannot avert their eyes to avoid the unwanted communication because funeral attendees have a "personal stake in honoring and mourning their dead," and that they "must go to the place designated for the memorial event." *Id*. at 618-19.

The interest analysis requires an appropriate balance between the First Amendment rights of Phelps-Roper and the interests of funeral attendees. *See Hill*, 530 U.S. at 714. On one side of the balance lies Phelps-Roper's First Amendment rights; though the messages Phelps-Roper intends to convey at funerals are widely offensive to many, their First Amendment protection is not lost. *See Street v. New York*, 394 U.S. 576, 592 (1969) ("[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."). On the other side of the equation is the State's interest in protecting mourners at funerals from unwanted intrusions.

Authority is limited on the question of whether a state has a significant interest in protecting funeral attendees from unwanted communication. Other than the district court below, two other district courts have analyzed similar funeral protest statutes, and concluded that funeral attendees are a captive audience from unwanted speech, and the state has a significant interest in their protection. *See Phelps-Roper v. Nixon*, 504 F. Supp. 2d 691, 696 (W.D. Mo. 2007), *rev'd*, 509 F.3d 480 (8th Cir. 2007) (holding that "picketing soldiers' funerals and belittling the sacrifices made by soldiers are intolerable actions, making protection of the funeral attendees a substantial interest for the state"); *McQuery v. Stumbo*, 453 F. Supp. 2d 975, 992 (E.D. Ky. 2006) (assuming for purposes of preliminary injunction analysis "that the state has an interest in protecting funeral attendees from unwanted communications that are so obtrusive that they are impractical to avoid"). However, in *Phelps-Roper v. Nixon*, 509 F.3d 480 (8th Cir. 2007), the Eighth Circuit reversed one of those district court decisions, holding that for purposes of preliminary injunction analysis, the plaintiff "has a fair chance of proving any interest the state has in protecting funeral mourners from unwanted speech is outweighed by the First Amendment right to free speech." *Id*. at 487.

The Supreme Court has held that the State is warranted in protecting individuals from unwanted communication that implicates certain privacy interests when the listener is somehow "captive" to the message. Specifically, the Court has held that a city could completely ban intrusive

residential picketing in order to protect residential privacy, *see Frisby*, 487 U.S. at 484-85, and that a state could restrict speakers from approaching unconsenting individuals entering a medical facility in order to protect the "right to avoid unwelcome speech" in that setting. *See Hill*, 530 U.S. at 715-18; *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 768 (1994) (recognizing a significant governmental interest in protecting the "medical privacy" and the "psychological" and "physical well-being of the patient held 'captive' by medical circumstance").

In *Frisby*, the Supreme Court upheld a restriction on residential picketing. The ordinance at issue "completely ban[ned] picketing 'before or about' any residence." *Frisby*, 487 U.S. at 476. The Court held that the ordinance served the "significant government interest" of "the protection of residential privacy." *Id.* at 484. The Court observed that "'[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society,'" *Id.* (quoting *Carey v. Brown*, 447 U.S. 455, 471 (1980)), and that the home is unique in the sense it is "'the last citadel of the tired, the weary, and the sick,'" *Frisby*, 487 U.S. at 484 (quoting *Gregory v. Chicago*, 394 U.S. 111, 125 (1969) (Black, J., concurring)), and "'the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits.'" *Frisby*, 487 U.S. at 484 (quoting *Carey*, 447 U.S. at 471).

Integral to the Court's analysis was the fact that individuals in their homes are captive audiences to unwanted communication. The *Frisby* Court explained:

> One important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different. That we are often captives outside the sanctuary of the home and subject to objectionable speech does not mean we must be captives everywhere. Instead, a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions.

*Frisby*, 487 U.S. at 484-85 (citations, quotation marks, and alterations omitted). The Court concluded that "[t]here simply is no right to force speech into the home of an unwilling listener." *Id.* at 485.

In *Hill*, the Supreme Court upheld a restriction on protests near abortion clinics. The statute at issue prohibited the unwanted approach within eight feet of another person outside an abortion clinic "for the purpose of engaging in oral protest, education, or counseling." *Hill*, 530 U.S. at 732. The Court held that the statute served the "significant and legitimate" governmental interests of providing "unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests." *Id.* at 715, 725-26. The Court noted that individuals who enter a health care facility, for whatever reason, "are often in particularly vulnerable physical and emotional conditions." *Id.* at 729. They "may be under special physical or emotional stress," *id.*, and could "potential[ly] [suffer] physical and emotional harm [] when an unwelcome individual delivers a message (whatever its content) by physically approaching . . . at close range." *Id.* at 718 n.25.

As in *Frisby*, the *Hill* Court found a significant interest because the audience to unwanted communication was captive. The Court emphasized the "importan[ce] when conducting this interest analysis to recognize the significant difference between state restrictions on a speaker's right to address a willing audience and those that protect listeners from unwanted communication." *Id.* at 715-16. The *Hill* Court cited *Frisby* for the proposition that "the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it," *id.* at 716 (citing *Frisby*, 487 U.S. at 487), and noted that "it may not be the content of the speech, as much as the deliberate verbal or visual assault, that justifies proscription." *Hill*,

530 U.S. at 716 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 210-11, n.6 (1975) (quotation marks and alteration omitted)). While it acknowledged the "recognizable privacy interest in avoiding unwanted communication varies widely in different settings," *Hill*, 530 U.S. at 716, the Court emphasized that its jurisprudence has recognized "the interests of unwilling listeners in situations where 'the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure.'" *Id.* at 718 (quoting *Erznoznik*, 422 U.S. at 209). The *Hill* Court added that "[t]he right to avoid unwelcome speech has special force in the privacy of the home . . . and its immediate surroundings," *Hill*, 530 U.S. at 717 (citing *Frisby*, 487 U.S. at 485), but the right "can also be protected in confrontational settings." *Hill*, 530 U.S. at 717. Therefore, the *Hill* Court analogized the privacy interest of individuals entering a medical facility to the residential privacy interest recognized in *Frisby*.

*Hill* also relied on *Madsen*, an earlier case that also addressed the First Amendment rights of abortion protesters outside a medical facility. In *Madsen*, the Court held that the following interests were sufficient to justify an appropriately tailored injunction to protect them: (1) the "interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy;" (2) the "interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks, and in protecting the property rights of all its citizens;" and (3) the "interest in residential privacy . . . applied by analogy to medical privacy." *Madsen*, 512 U.S. at 767-68. However, in *Madsen*, the Court struck certain measures under the more stringent standard for injunctions because the measures burdened more speech than necessary to meet those interests. *See id.* at 771-75 (striking measures establishing a 36-foot buffer zone from the sides of the clinic abutting private property; establishing a blanket ban on all "images observable" from clinic; establishing a 300-foot buffer zone from medical clinic within which the measure banned the unconsented approach of entrants to the medical facility; and establishing a 300-foot buffer zone from the residences of clinic staff within which protesting was banned).

Individuals mourning the loss of a loved one share a privacy right similar to individuals in their homes or individuals entering a medical facility. Indeed, the Supreme Court has already recognized the privacy right of individuals to control the body and death images of deceased family members sufficient to prevent their disclosure under the Freedom of Information Act. *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004). In *Favish*, the Supreme Court held that an individual's request for death scene photographs of a public official were protected from disclosure under Exemption 7(C) of the Act "when the family [of the decedent] objects to the release of photographs showing the condition of the body at the scene of death." *Id.* at 160. The Court based its holding on cultural traditions and common law protections.

The Court initially noted the cultural significance of burial rites:

> Burial rites or their counterparts have been respected in almost all civilizations from time immemorial. *See generally* 26 Encyclopaedia Britannica 851 (15th ed. 1985) (noting that "[t]he ritual burial of the dead" has been practiced "from the very dawn of human culture and . . . in most parts of the world"); 5 Encyclopedia of Religion 450 (1987) ("[F]uneral rites . . . are the conscious cultural forms of one of our most ancient, universal, and unconscious impulses"). They are a sign of the respect a society shows for the deceased and for the surviving family members. The power of Sophocles' story in Antigone maintains its hold to this day because of the universal acceptance of the heroine's right to insist on respect for the body of her brother. *See* Antigone of Sophocles, 8 Harvard Classics: Nine Greek Dramas 255 (C. Eliot ed. 1909).

*Id*. at 167-68. The Court went on to discuss the effect of unwanted public intrusion on the survivors' mourning of the deceased:

> The outrage at seeing the bodies of American soldiers mutilated and dragged through the streets is but a modern instance of the same understanding of the interests decent people have for those whom they have lost. *Family members have a personal stake in honoring and mourning their dead and objecting to unwarranted public exploitation that, by intruding upon their own grief, tends to degrade the rites and respect they seek to accord to the deceased person who was once their own.*

*Id*. at 168 (emphasis added). The Court then acknowledged that in addition to the "well-established cultural tradition acknowledging a family's control over the body and death images of the deceased," the common law recognized a survivor's right to privacy in protecting the memory of the deceased:

> "It is the right of privacy of the living which it is sought to enforce here. That right may in some cases be itself violated by improperly interfering with the character or memory of a deceased relative, but it is the right of the living, and not that of the dead, which is recognized. A privilege may be given the surviving relatives of a deceased person to protect his memory, *but the privilege exists for the benefit of the living, to protect their feelings, and to prevent a violation of their own rights in the character and memory of the deceased.*"

*Id*. at 168-69 (quoting *Schuyler v. Curtis*, 42 N.E. 22, 25 (N.Y. 1895) (emphasis added)).

Against this backdrop, the Court held that the Freedom of Information Act "recognizes surviving family members' right to personal privacy with respect to their close relative's death-scene images," because "the statutory privacy right protected by Exemption 7(C) goes beyond the common law and the Constitution," and "[i]t would be anomalous to hold in the instant case that the statute provides even less protection than does the common law." *Favish*, 541 U.S. at 170.

The concerns for a survivor's rights articulated in *Favish* are perhaps even greater in the context of a funeral or burial service. As the *Favish* Court observed, burial rites implicate the most basic and universal human expression "of the respect a society shows for the deceased and for the surviving family members." *Id*. at 168. A funeral or burial service is a moment of collective, shared grief when many come to pay their final respects to the deceased and to offer comfort to one another. As such, funeral attendees "have a personal stake" in "objecting to unwarranted public exploitation that . . . intrud[es] upon their own grief." *Id*. Unwanted intrusion during the last moments the mourners share with the deceased during a sacred ritual surely infringes upon the recognized right of survivors to mourn the deceased.

Furthermore, just as a resident subjected to picketing is "left with no ready means of avoiding the unwanted speech," *Frisby*, 487 U.S. at 487, mourners cannot easily avoid unwanted protests without sacrificing their right to partake in the funeral or burial service. And just as "[p]ersons who [] attempt[] to enter health care facilities . . . are often in particularly vulnerable physical and emotional conditions," *Hill*, 530 U.S. at 729, it goes without saying that funeral attendees are also emotionally vulnerable.

Phelps-Roper, however, contends that funeral attendance is voluntary and funeral attendees can merely "avert their eyes" from undesired communication to avoid funeral protests. To begin with, attendance at a funeral or burial service cannot be dismissed as nothing more than a "voluntary" activity. As Respondents assert, "deep tradition and social obligation, quite apart from the emotional support the grieving require," compel individuals to attend a funeral or burial service. Furthermore, if individuals "want to take part in an event memorializing the deceased, they must go to the place designated for the memorial event." *McQueary*, 453 F. Supp. 2d at 992. Friends and

family of the deceased should not be expected to opt-out from attending their loved one's funeral or burial service. *Cf. Hill*, 530 U.S. at 716 ("The First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests.") (quoting *Madsen*, 512 U.S. at 772-73) (quotation marks and alteration omitted)). Nor can funeral attendees simply "avert their eyes" to avoid exposure to disruptive speech at a funeral or burial service. The mere presence of a protestor is sufficient to inflict the harm. *See Frisby*, 447 U.S. at 478 (noting that "the 'evil' of targeted residential picketing" is "the very *presence* of an unwelcome visitor at the home") (emphasis added).

Accordingly, we agree with the district court's conclusion that Ohio has an important interest in the protection of funeral attendees, because a deceased's survivors have a privacy right "in the character and memory of the deceased."

## C. The Funeral Protest Provision is Narrowly Tailored

Next, we determine whether the Funeral Protest Provision is narrowly tailored to serve the important interest in the protection of funeral attendees. The district court held that the Funeral Protest Provision was narrowly tailored and not substantially overbroad. The district court reasoned that Phelps-Roper "fail[ed] to demonstrate that the statute's purported overbreadth is either real or substantial" and "the fact that [she] can conceive of some potentially impermissible applications is not enough to render it unconstitutional." *Phelps-Roper*, 523 F. Supp. 2d at 619.[1]

Under the narrow tailoring requirement, the Supreme Court has emphasized that "when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill*, 530 U.S. at 726. "[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 798 (quotations marks, citation, and alteration omitted).

Phelps-Roper contends that the Funeral Protest Provision is not narrowly tailored for three reasons. First, she argues that the provision is not narrowly tailored because it "bans all speech" within 300 feet of a funeral or burial service during the relevant time period, and that it covers more

---

[1]Two recent cases have considered similar statutes in the preliminary injunction context, and found that the plaintiffs had a probable chance of success in proving the funeral picketing statutes at issue were not narrowly tailored. *See McQueary v. Stumbo*, 453 F. Supp. 2d 975, 979 (E.D. Ky. 2006) (granting preliminary injunction to plaintiff who picketed funerals with members of the Westboro Baptist Church in challenge to Kentucky statute that criminalized picketing within 300 feet of funeral site); *Phelps-Roper v. Nixon*, 509 F.3d 480, 488 (8th Cir. 2007) (reversing district court's denial of preliminary injunction to Phelps-Roper in challenge to Missouri statutes that criminalized picketing "in front or about" a funeral location or procession).

In *McQueary*, the district court found that Kentucky's funeral protest statute was not narrowly tailored. First, the district court held that the statute burdened protected speech whether or not the protesters were even visible to funeral attendees, the speech could be heard by attendees, or whether the attendees might easily avoid the speech. *McQueary*, 453 F. Supp. 2d at 996. Second, the court found that "the 300-foot buffer zone is substantially larger than the 36-foot buffer zone upheld in *Madsen*, the 8-foot floating buffer zone upheld in *Hill* and the single-resident zone upheld in *Frisby*." *Id*. The court declined to apply a limiting construction to the Kentucky statute and concluded that it was substantially overbroad. *Id*. at 997.

In *Phelps-Roper v. Nixon*, the Eighth Circuit, while not reaching the merits of Phelps-Roper's claim, distinguished *Frisby* and another Eighth circuit case, *Douglas v. Brownell*, 88 F.3d 1511 (8th Cir. 1996) (upholding a ban on picketing "before, about, or immediately adjacent to" a residence), on the basis that those cases "involve residences and fixed locations," while the statute under consideration defined "funeral" to include "'processions' held in connection with burial and cremation." *Phelps-Roper v. Nixon*, 509 F.3d at 487. Thus, the statute involved a "floating" buffer zone which "provide[s] citizens with no guidance as to what locations will be protest and picket-free zones and at what times." *Id*.

than just protests targeting a funeral or burial service. Thus, under her reading of the provision, any form of picketing within 300 feet of a funeral or burial service would run afoul of the Funeral Protest Provision. As a hypothetical example, she contends that PETA could "effectively be completely banned" from protesting a furrier located near a funeral home that holds "multiple funeral services every day of the week." Respondents counter that the Funeral Protest Provision is narrow in scope, "only affect[ing] those protest activities that recklessly or intentionally disrupt, or are undertaken to disrupt, funeral services."

The Funeral Protest Provision only restricts picketing or other protest activities that are directed at a funeral or burial service. The Funeral Protest Provision is similar to the ordinance at issue in *Frisby*, which the Supreme Court held limited speech focused on a particular place. In *Frisby*, the Court found that the use of the singular form to designate the place from which picketing was proscribed "suggests that the ordinance is intended to prohibit only picketing focused on, and taking place in front of, a particular residence." *Frisby*, 487 U.S. at 482. Under the Court's construction, "[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses, is not prohibited." *Id.* at 483. The Court further explained that this construction was "supported by the representations of counsel for the town at oral argument" indicating "that the town takes . . . a limited view of the 'picketing' proscribed by the ordinance." *Id.* The Funeral Protest Provision similarly employs the singular form to designate the place from which its restrictions apply, given that it restricts protest activities within 300 feet from "any residence, cemetery, funeral home, church, synagogue, or other establishment" where "an actual funeral or burial service" is "conduct[ed] . . . *at that place*." § 3767.30 (emphasis added). The Funeral Protest Provision's definition of "other protest activities" as "any action that is disruptive or undertaken to disrupt or disturb *a funeral or burial service*," further supports this reading. *Id.* (emphasis added).

Thus, properly read, the Funeral Protest Provision restricts only the time and place of speech directed at a funeral or burial service. If a protestor's communication is not directed at a funeral or burial service, the mere fact that one holds a picket sign within 300 feet of a funeral or burial service during the relevant time period, without more, will not support a conviction under § 3767.30. By the same token, the subject matter of the sign is irrelevant given that the statute does not regulate speech based on its content. *See Hill*, 530 U.S. at 716 ("[I]t may not be the content of the speech, as much as the deliberate verbal or visual assault, that justifies proscription.") (citation and quotation marks omitted)); *Frisby*, 487 U.S. at 498 (Stevens, J., dissenting) ("Picketing is a form of speech that, by virtue of its repetition of message and often hostile presentation, may be disruptive of an environment irrespective of the substantive message conveyed.")

Phelps-Roper also argues that the Funeral Protest Provision is not narrowly tailored because the 300-foot buffer zone is excessive. However, *Frisby*, *Hill*, and *Madsen*, read together, establish that the size of the buffer zone is context-sensitive, and that in this case, the 300-foot buffer zone is not too broad. *See Madsen*, 512 U.S. at 772 ("We must, of course, take account of the place to which the regulations apply in determining whether these restrictions burden more speech than necessary.").

In *Frisby*, the Court upheld as constitutional an ordinance that completely prohibited focused residential picketing "before or about" a residence. *Frisby*, 487 U.S. at 483 ("[I]n order to fall within the scope of the ordinance the picketing must be directed at a single residence."). The ordinance did not specify a specific distance from which picketing was prohibited, and the *Frisby* Court did not further elaborate. *See Vittitow v. City of Upper Arlington,* 43 F.3d 1100, 1111 (6th Cir. 1995) (Martin, J., dissenting) ("If *Frisby* created a 'zone,' we have no idea how large the 'zone' is, i.e. how far back from the front of a house picketers must be, et cetera."); *Veneklase v. City of Fargo*, 78 F.3d 1264, 1269 (8th Cir. 1996) ("[U]pon a careful reading of *Frisby*, we do not find that its holding defined the outer parameters of 'focused' residential picketing."). The *Frisby* Court

observed that a "complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." *Id*. at 485. The Court found that "the 'evil' of targeted residential picketing is created by the medium of expression itself," given that residents targeted by picketing are "trapped within the home, and because of the unique and subtle impact of such picketing," residents are "left with no ready means of avoiding the unwanted speech." *Id*. at 486-87. Thus, the Court held that the ordinance was narrowly tailored because "the picketing prohibited by the [] ordinance is speech directed primarily at those who are presumptively unwilling to receive it." *Id*. at 488.

In *Hill*, the Supreme Court upheld a statute that restricted speech activities within 100 feet of the entrance to any health care facility, prohibiting anyone within the regulated areas to "knowingly approach" within eight feet of another person, without that person's consent, "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person." *Hill*, 530 U.S. at 707. The measure served the important interest of "unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests." *Id*. at 715 (citing *Madsen*, 512 U.S. 753). In finding the law narrowly tailored, the Court in *Hill* stressed that the state law did not overly burden the speaker's ability to communicate. The Court noted that the restriction providing for the eight-foot separation between the speaker and the audience "should not have any adverse impact on the readers' ability to read signs displayed by demonstrators." *Hill*, 530 U.S. at 726. The law also "place[d] no limitations on the number, size, text, or images of the placards." *Id*. And although the distance requirement may increase the difficulty in a speaker's ability to be heard, "the statute place[d] no limitation on the number of speakers or the noise level, including the use of amplification equipment." *Id*.

In *Madsen*, the Supreme Court rejected a court-ordered injunction that banned, inter alia, residential picketing within 300 feet of the homes of persons employed by medical clinics performing abortions. *Madsen*, 512 U.S. at 774-75. In contrast to *Frisby*, the Court found the 300-foot buffer zone around clinic employee residences too broad. The Court explained:

> [T]he 300-foot zone around the residences in this case is much larger than the zone provided for in the ordinance which we approved in *Frisby*. The ordinance at issue there made it "unlawful for any person to engage in picketing before or about the residence or dwelling of any individual." The prohibition was limited to focused picketing taking place solely in front of a particular residence. By contrast, the 300-foot zone would ban general marching through residential neighborhoods, or even walking a route in front of an entire block of houses. The record before us does not contain sufficient justification for this broad a ban on picketing; it appears that a limitation on the time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired result.

*Id*. at 775 (citations, alterations, and quotation markets omitted).

Taking full account of the Funeral Protest Provision's time limitation, the provision is in certain senses narrower than the measures in *Frisby*, *Hill*, and *Madsen*. The lesson of *Frisby* is that a narrow class of speech can be prohibited to further a recognized privacy interest within a geographic scope that extended, at the very least, to the area "before or about" a residence. Because the Funeral Protest Provision furthers a governmental interest akin to that at issue in *Frisby*, Ohio may prescribe funeral picketing within some distance from the protected area, the funeral site. In one significant aspect, however, the Funeral Protest Provision is narrower than the measure in *Frisby*. While the ordinance in *Frisby* constituted a perpetual ban on picketing, the Funeral Protest Provision is only in effect for a limited time, within one hour of a funeral or burial service.

Phelps-Roper seeks to distinguish *Frisby* by arguing that her "speech is not directed exclusively at mourners, but also at the general public." But the *Frisby* Court recognized that the speech at issue in that case could still have a "broader communicative purpose" and still be proscribed by the ordinance. *See Frisby*, 487 U.S. at 486 ("[E]ven if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy.") The State has an important interest in protecting funeral attendees from unwanted communication, even if the communication has a broader audience.

The Funeral Protest Provision is in some respects as or more narrow in scope than the restrictions at issue in *Hill*. Similar to the law at issue in *Hill*, the Funeral Protest Provision does not place "limitations on the number, size, text, or images" of placards, and places "no limitation on the number of speakers or the noise level, including the use of amplification equipment." Thus, it is conceivable that picketers outside of the 300-foot buffer zone can still communicate their message to funeral attendees. The Funeral Protest Provision is narrower than the restrictions in *Hill* in that it is in effect for a limited time. Granted, the buffer zone here is 200 feet greater than the 100-foot buffer zone upheld in *Hill*. But it serves a similar purpose, and here it protects a group of individuals who may arrive and depart from the funeral or burial service in a coordinated fashion.

As for *Madsen*, although the residential speech restriction at issue in that case has an identical buffer zone, *Madsen* is nonetheless distinguishable on two principal grounds. First, unlike the ordinance at issue in *Frisby*, or the law at issue in *Hill*, the *Madsen* Court reviewed a court-ordered *injunction*–rather than a legislatively-imposed time, place, and manner restriction on public fora. "Ordinances represent a legislative choice regarding the promotion of particular societal interests. Injunctions, by contrast, are remedies imposed for violations (or threatened violations) of a legislative or judicial decree." *Madsen*, 512 U.S. at 764. The Court therefore applied a "somewhat more stringent" degree of scrutiny for evaluating injunctions, requiring that restrictions burden "no more speech than necessary to serve a significant government interest." *Id.* at 765. Although not as stringent as strict scrutiny, this heightened standard is more stringent than that for statutes, which must be "narrowly tailored to serve a significant governmental interest." *Id.* at 766-67. *Madsen* is not controlling because the Funeral Protest Provision was legislatively enacted, and therefore subject to a less stringent test.

Second, unlike the ordinance at issue in *Frisby* and the Funeral Protest Provision in this case, the injunction construed by the *Madsen* Court did not prohibit only focused picketing. The *Madsen* Court found that "the 300-foot zone would ban general marching through residential neighborhoods, or even walking a route in front of an entire block of houses." *Id.* at 775 (quotation marks, citation, and alteration omitted). The *Frisby* Court, in contrast, found that the ordinance at issue did not prohibit "[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses." *Frisby*, 487 U.S. at 483. The Funeral Protest Provision, by its terms, does not necessarily proscribe marching or walking within the 300-foot zone. And, unlike the residential speech restriction in *Madsen*, the Funeral Protest Provision limits the time in which the ban on picketing is in effect. Thus, in two significant ways the Funeral Protest Provision is less sweeping than the ordinance at issue in *Madsen*, which was stricken under a heightened standard of review.

Thus, the Funeral Protest Provision is in certain aspects narrower than the analogous measures in *Frisby*, *Hill*, and *Madsen*. Phelps-Roper is not silenced during a funeral or burial service, but must merely stay 300 feet away within a brief window of time,[2] outside of which she may say what she wants, wherever she wants, and when she wants, with no limitation on the number

---

[2]The evidence in the record demonstrates the limited duration of time when the Funeral Protest Provision is effective. According to the affidavit of Roger Primm, the funeral director of the Denbow-Primm-Kemery Funeral Home in Ashland, Ohio, most funerals begin at 11:00 a.m. and the burial ceremonies end before 3:00 p.m.

of speakers or the noise level, including the use of amplification equipment, and no limitations on the number, size, text, or images of placards.

At the same time, the interest at issue here requires a larger buffer zone than the interests in *Frisby*, *Hill*, and *Madsen*. Given that numerous mourners usually attend a funeral or burial service, the size of a buffer zone necessary to protect the privacy of an entire funeral gathering can be expected to be larger than that necessary to protect the privacy of a single residence, or a single individual entering a medical clinic. Moreover, a 300-foot buffer zone takes account of the logistical problems associated with moving large numbers of people from the site of a funeral to the burial site. The protection of access to a funeral or burial service is an important governmental interest. *Cf. Madsen,* 512 U.S. at 768 (upholding an injunctive measure prohibiting individuals from "'congregating, picketing, patrolling, demonstrating or entering' any portion of the public right-of-way or private property within 36 feet of the property line of the clinic as a way of ensuring access to the clinic"); *see also Cameron v. Johnson*, 390 U.S. 611, 612 (1968) (upholding a statute that prohibited interference with ingress or egress from any public premises). Thus, a 300-foot buffer zone does not render the Funeral Protest Provision invalid.

As her third reason that the Funeral Protest Provision is not narrowly tailored, Phelps-Roper argues that Ohio already maintains laws that "prohibit physically haranguing funeral goers," such that funeral attendees are "thoroughly protected from all unwanted physical acts by existing" Ohio law.[3] Phelps-Roper misses the point of the Funeral Protest Provision. Its purpose is not simply to protect funeral attendees from physical acts, but from the harmful psychological effects of unwanted communication when they are most captive and vulnerable.

In sum, the Funeral Protest Provision, which restricts protest activities within 300 feet of a funeral or burial service, is narrowly tailored to meet Ohio's legitimate interest in protecting funeral attendees from unwanted communication.

**D.  The Funeral Protest Provision Leaves Open Alternative Channels of Communication**

Finally, we consider whether the Ohio statute leaves open ample alternative channels of communication. The district court found that "the statute provides [Phelps-Roper] with alternative channels of communication through which she can deliver her message" because she "is free to express her message outside of the times and places set forth in the statute, and the statute does not create a barrier to [Phelps-Roper]'s use of other means to deliver her message to the public." *Phelps-Roper*, 523 F. Supp. 2d at 620.

In *Frisby*, the Supreme Court held that an ordinance prohibiting picketing in front of someone's home afforded ample alternative channels of communication because "[p]rotestors have not been barred from the residential neighborhoods. They may enter such neighborhoods, alone or in groups, even marching. They may go door-to-door to proselytize their views. They may distribute literature in this manner or through the mails. They may contact residents by telephone, short of harassment." *Frisby*, 487 U.S. at 483-84 (alterations omitted).

Phelps-Roper not only has available the same channels of communication as the protestors at issue in *Frisby,* she actually has more channels of communication. Unlike the around-the-clock blanket ban on focused residential picketing at issue in *Frisby*, the Funeral Protest Provision only restricts picketing for a limited temporal duration–from one hour before until one hour after a funeral or burial service. Phelps-Roper may protest at the funeral site during times of her choosing that are

---

[3]Phelps-Roper cites the following statutes: Ohio Rev. Code §§ 2911.21 (criminal trespass), 2903.13 (assault), 2903.22 (menacing), 2917.01 (inciting to violence), 2917.11 (disorderly conduct), § 2909.07(A)(1) (criminal mischief).

outside of the proscribed time period. She may also engage in "targeted" protests of the funeral site *at all times* outside of the 300-foot buffer zone.

Furthermore, Phelps-Roper is not entitled to her best means of communication. *See Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) ("It is [] common ground . . . that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."). Phelps-Roper readily admits in her brief that she "can share her message through her church's website or other means," and she "does not claim that funeral protests are her most effective channels of communication." Moreover, mourners at a funeral are not her primary audience, as she openly admits in her brief that a "funeral is the occasion of her speech, not its audience." *See Prime Media, Inc. v. City of Franklin*, 181 F. App'x 536, 541 (6th Cir. 2006) (holding that ample alternative channels of communication existed where the plaintiff's "intended audience-persons who drive on I-65-can obviously be reached through a variety of means when they are not on the interstate"); *cf. Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) ("An alternative is not ample if the speaker is not permitted to reach the intended audience.") (internal quotation marks omitted)). As Respondents argue, Phelps-Roper has an "international audience with her website, where her message is seen by millions" and she has appeared on national radio and television." In short, there is no merit to any contention that the Funeral Protest Provision leaves her without ample alternative channels of communication.

Accordingly, the Funeral Protest Provision affords Phelps-Roper ample alternative channels of communication.

As the *Frisby* Court has remarked, we need not further consider obscure "hypothetical applications" of the challenged provision to find it valid on its face. *See Frisby*, 487 U.S. at 488 ("Of course, this case presents only a facial challenge to the ordinance. Particular hypothetical applications of the ordinance-to, for example, a particular resident's use of his or her home as a place of business or public meeting, or to picketers present at a particular home by invitation of the resident-may present somewhat different questions.") This is especially true in light of the limited factual record before us in the pre-enforcement facial challenge to the statute. *See Washington State Grange*, 128 S. Ct. at 1191; (stating that facial challenges are also disfavored because the principle of judicial restraint counsels against a constitutional ruling "in advance of the necessity of deciding it" and to avoid a broader constitutional ruling than necessary). Finally, to rule otherwise at this juncture would "short circuit the democratic process," because as written, the statute can be applied in a constitutional manner. *See id.*

## III. CONCLUSION

Because we find that the Funeral Protest Provision is content-neutral, serves an important governmental interest, is narrowly tailored, and affords ample alternative channels of communication, we hold that it is a reasonable time, place, and manner restriction that does not violate the First Amendment. Because Phelps-Roper's overbreadth claim is premised on the allegation that the Funeral Protest Provision is not a reasonable time, place, and manner restriction on speech, her overbreadth claim likewise fails. For these reasons, we **AFFIRM** the judgment of the district court.