**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-2131

_____

MICHAEL MARCAVAGE, Appellant

v.

CITY OF PHILADELPHIA, PENNSYLVANIA;
WILLIAM V. FISHER, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES;
SGT. CRAIG SMITH, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES;
OFFICERS JOHN DOE; OFFICERS JANE DOE,
UNKNOWN OFFICERS WHO PARTICIPATED IN THE VIOLATION OF
PLAINTIFF'S RIGHTS,
IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES;
OFFICER STUSKI, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES;
OFFICER BROWN, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES;
OFFICER WIGGINS, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES;
SGT. DEMALTO, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-09-cv-02477)
District Judge: Honorable Eduardo C. Robreno

_____

Argued April 19, 2012

Before:   VANASKIE, BARRY AND CUDAHY,[*] *Circuit Judges*

(Filed: May 29, 2012)

_____

[*] Honorable Richard D. Cudahy, Circuit Judge for the Seventh Circuit Court of
Appeals, sitting by designation.

L. Theodore Hoppe, Jr., Esq. *(ARGUED)*
Hoppe & Martin, LLP
423 McFarlan Road
Kennett Square, PA 19348

    *Counsel for Appellant*

Jane Lovitch Istvan, Esq. *(ARGUED)*
City of Philadelphia Law Department
1515 Arch St., 17th Floor
Philadelphia, PA 19102

    *Counsel for Appellees*

_____

OPINION OF THE COURT

_____

VANASKIE, *Circuit Judge.*

This appeal presents us with another case brought by Michael Marcavage arising out of his interactions with law enforcement authorities while Marcavage and others engaged in demonstrations in public places.[1] This action asserts violations of Marcavage's First, Fourth, and Fourteenth Amendment rights by the City of Philadelphia ("the City") and a number of its police officers. The District Court granted the defendants' motion for summary judgment, and we will affirm.

I.

We write primarily for the parties, who are familiar with the facts and procedural history of this case. Accordingly, we set forth only those facts necessary to our analysis.

---

[1] Other cases involving similar circumstances and Marcavage include *Marcavage v. National Park Service*, 666 F.3d 856 (3d Cir. 2012), *Marcavage v. City of Chicago*, 659 F.3d 626 (7th Cir. 2011), *United States v. Marcavage*, 609 F.3d 264 (3d Cir. 2010), and *Startzell v. City of Phila.*, 533 F.3d 183 (3d Cir. 2008).

2

This litigation arises from incidents at four events in Philadelphia: (1) the June 10, 2007 PrideFest; (2) the June 8, 2008 PrideFest; (3) the November 15, 2008 Proposition 8 demonstration; and (4) the May 3, 2009 Equality Forum.[2] Organizers at each event had obtained permits from the City to undertake their public demonstrations, which were generally supportive of gay rights. At each event, Marcavage and his group vocally condemned homosexuality. In all instances, event participants reacted by "shouting at, debating with, trying to surround, and getting physically close to Marcavage and members of his group." *Marcavage v. City of Phila.*, 778 F. Supp. 2d 556, 564 (E.D. Pa. 2011). In order to prevent the confrontations from escalating out of control, City police officers separated Marcavage and members of his group from those supporting the causes for which public demonstration permits were obtained. At three of the events, Marcavage and his group were relocated only about twenty feet from where they wanted to be. *Id.* at 566. The largest relocation appears to have occurred during the Proposition 8 demonstration – at this event, Marcavage claims to have been moved "40 to 50 feet away" from where he wanted to stand. (A. 73.) Although separated from the demonstrators, it is undisputed that Marcavage and his group were able "to preach to the crowd with amplified sound, speak with participants passing by, hand out leaflets, and carry large signs." *Marcavage*, 778 F. Supp. 2d at 564.

---

[2] Three of these four events were videotaped. (*See* A. 44-46.) The November 15, 2008 Proposition 8 demonstration was not recorded.

3

During the May 3, 2009 Equality Forum, Jake Gardner, a member of Marcavage's group, was physically separated from the event marchers by police officers.[3] When Marcavage sought to protest Gardner's treatment, he was grabbed by an officer and moved approximately five feet from the street and onto the sidewalk. A scuffle between Marcavage and several officers ensued when Marcavage was seen with a silver object in his hands. Marcavage states that he was placed in a "choke hold." *Id.* at 568, n.17. Once it was determined that the object was a camera, the hold was released, though the officer kept his hand on Marcavage's back for an additional five seconds while Marcavage argued with another officer. After those five seconds, the officer removed his hand from Marcavage's back and his camera was returned to him.

Marcavage's complaint asserts that the actions of the City police officers in separating him from the demonstrators abridged his First Amendment rights. Applying *Startzell*, another case involving Marcavage and with facts that "are almost identical to those" here, the District Court held that Marcavage's First Amendment rights were not infringed. *Id.* at 565.

Marcavage's complaint also asserts that his Fourth Amendment rights were violated during the physical encounter he had with police at the May 3, 2009 Equality Forum. The District Court found no violation of Marcavage's Fourth Amendment rights arising from this incident. The initial seizure of Marcavage was not unreasonable, the District Court reasoned, because the police officers had a justifiable basis to restrain Marcavage to control the situation, and the seizure lasted for just over one minute and

---

[3] This entire encounter was videotaped. (*See* A. 46.)

"ended once the situation . . . was stabilized." *Id.* at 569. On the issue of unreasonable force, the District Court found that the force employed by the officers was justified "in light of the circumstances," because "safety is a primary concern for officers that are engaged in seizing an individual," and was not excessive given its short duration and the fact that "Marcavage did not seem to struggle to remain standing" while in the "choke hold" and "was able to shout during the struggle." *Id.* at 571.

Finally, Marcavage's complaint asserts that his rights to freedom of travel, privacy, and equal protection were violated during each of the four events. The District Court concluded that in no instance was there a violation of any of these rights.

## II.

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343, and we have appellate jurisdiction under 28 U.S.C. § 1291. Our review of a grant of summary judgment is *de novo*, and we apply the same standard as the District Court. *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). "This requires that we view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Id.* Summary judgment shall be granted where no genuine dispute exists as to any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

## A.

We begin by examining Marcavage's First Amendment claims. As we observed in *Startzell*, there are three questions that underpin the analysis of a First Amendment challenge arising from exclusion from an event: "(1) whether the speech is 'protected by

5

the First Amendment'; (2) 'the nature of the forum'; and (3) whether the government's 'justifications for exclusion from the relevant forum satisfy the requisite standard.'" 533 F.3d at 192 (quoting *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).  The first two considerations are uncontested, as both parties agree Marcavage's speech is protected by the First Amendment and the streets and sidewalks of Philadelphia are a public forum.  The only First Amendment issue, then, is whether the City's restrictions on speech in this instance are "'justified without reference to the content of the regulated speech, . . . narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information.'" *Id.* at 197 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Marcavage argues "that his speech and his movements were restricted because of the content of his message and/or the crowd's reaction, real or perceived, to that message." (Appellant's Br. at 22.)  In particular, Marcavage points to the fact that Captain Fisher referred to Marcavage as the leader of a "dissident group" in need of police protection.  (Appellant's Reply Br. at 7.)  Marcavage argues that "if he had a message that was pro-homosexual, Fisher would not have bothered him at all." (Appellant's Reply Br. at 8.)  Marcavage concludes that this amounts to viewpoint discrimination.  Marcavage also contends that moving him because the crowd did not like his message "constitutes an unconstitutional heckler's veto."  (Appellant's Br. at 41.) (citation omitted).

6

We disagree with Marcavage's analysis. There is no evidence from any of the events that the City relocated Marcavage because it disagreed with the content of his speech. While the officers did necessarily consider the content of Marcavage's speech when deciding to impose restrictions on him that would separate his counter-protest from event participants, this does not make the restrictions content-based. As the Supreme Court observed in *Hill v. Colorado*, 530 U.S. 703, 721 (2000):

> It is common in the law to examine the content of a communication to determine the speaker's purpose. Whether a particular statement constitutes a threat, blackmail, an agreement to fix prices, a copyright violation, a public offering of securities, or an offer to sell goods often depends on the precise content of the statement. We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct.

The Supreme Court further explained in *Ward* that "[t]he government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." 491 U.S. at 791 (citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986)).

In all instances, the officers acted with a purpose that was distinct from suppressing the content of Marcavage's speech. We explained in *Startzell* that "[t]he right of free speech does not encompass the right to cause disruption." 533 F.3d at 198. The City did not restrict Marcavage's speech because it disagreed with what he was saying – rather, Marcavage's speech was restricted in order to maintain public order.

7

The second prong of the analysis is whether the City's actions were narrowly tailored to serve a significant governmental interest. We held in *Startzell* that the City possesses a significant interest in keeping the peace and ensuring that the message of the permitted events is effectively conveyed. *See id.* Marcavage, as a counter-protestor, certainly "possess[es] a First Amendment right to communicate [his] message in a public forum," but his "rights are not superior to the First Amendment rights of" the event organizers. *Id.*

The officers allowed Marcavage to speak directly to the crowd until they determined the level of the rhetoric might incite a physical altercation. At this point, Marcavage was relocated a short distance away from event participants. As the District Court observed, this was "often only fifteen to twenty feet from where he wished to be," *Marcavage*, 778 F. Supp. 2d at 566, and in no event was it ever more than fifty feet away from where Marcavage wanted to speak. (*See* A. 73.) Once separated from the crowd, the officers allowed Marcavage to continue to convey his message through bullhorns, individual conversation, leaflets, and large signs.

"[R]estrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" *Ward*, 491 U.S. at 797 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). The City did not have to impose the least restrictive alternative on Marcavage: "the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the

8

regulation.'" *Id.* at 799 (quoting *Albertini*, 472 U.S. at 689). The City's actions satisfy this standard.[4]

The final prong of the analysis is whether the City left open to Marcavage ample alternative channels for communication. *Startzell* is again on point. We noted there that if a speaker was unable to reach his " 'intended audience,'" the "'alternative is not ample.'" 533 F.3d at 202 (quoting *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990)). As in *Startzell*, however, Marcavage was able to reach his intended audience after having been moved a short distance from his preferred location. At each event Marcavage continued to communicate with event participants through amplified sound, signage, leaflets, and individual conversations. While the relocation may have diminished the reach of his message to some extent, a reduction in degree of the potential audience "is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate." *Ward*, 491 U.S. at 802 (citations omitted).

---

[4] Marcavage also relies upon a settlement agreement that the City entered into with an unrelated protestor in which the City agreed to train its officers to allow demonstrators to "'stand anywhere'" unless there was "'specific danger or actual obstruction of vehicular or pedestrian travel.'" (*See* Appellant's Br. at 47.) (quoting A. 116.) We note first that Marcavage has no power to enforce this agreement, as it is not a consent decree and Marcavage is a stranger to the settlement. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975). Furthermore, Marcavage conveniently omits the sentence following the one he quotes: "In situations where groups with opposing viewpoints seek to protest at a particular location, Civil Affairs Officers maintain the ability to negotiate for people with opposing viewpoints to stand in different areas in order to prevent disruption so long as those persons are within sight and sound of their audience." (A. 116.) Even if Marcavage could enforce the settlement, the officers' conduct at the events in question was consistent with the terms of the agreement.

9

Marcavage unsuccessfully attempts to distinguish *Startzell*. He notes that "*Startzell* involved . . . a group of demonstrators [who] were *removed from within a permitted event*," but here, on the other hand, "Marcavage was not even inside of the event area." (Appellant's Br. at 26-27.) Furthermore, Marcavage argues that "there is no evidence in this case that Marcavage did anything to disrupt the event," unlike in *Startzell*, where Marcavage and his group "'used loud bullhorns to express their message near the stage area, directly addressed an Outfest attendee in a confrontational manner, and blocked access to the vendor booths.'" (Appellant's Br. at 27.) (quoting *Startzell*, 533 F.3d at 199).

Marcavage would limit *Startzell*'s holding to the boundary of a permitted event, so that counter-protestors could freely disrupt an event so long as they never set foot within it. This would completely eviscerate *Startzell*, as counter-protestors could completely block the entrance to an event, or direct amplified sound from the perimeter of the event so as to drown out event speakers. *Startzell* identifies as a significant governmental interest the ability of the City to ensure "that a permit-holder can use the permit for the purpose for which it was obtained." 533 F.3d at 198. This interest does not end at the physical border of the permitted event.

We also disagree that "there is no evidence in this case that Marcavage did anything to disrupt the event." (Appellant's Br. at 27.) While the disruption he caused in *Startzell* may have been greater than here, this is merely a difference of degree. At each event in question Marcavage attracted agitated crowds, and during the Equality Forum one of his associates had a physical encounter with an event participant.

10

In any event, police officers are not required to wait for actual disorder before imposing minimal restrictions. As the Eighth Circuit noted in *ACORN v. St. Louis County*, "[t]he government need not wait for accidents to justify safety regulations." 930 F.2d 591, 596 (8th Cir. 1991) (citation omitted). Accordingly, Marcavage's claim under the First Amendment fails.

B.

With respect to the May 3, 2009 Equality Forum, Marcavage argues that the officers had no "reason to suspect that 'criminal activity was afoot,'" thus rendering the officers' conduct in seizing him unreasonable and a violation of the Fourth Amendment. (Appellant's Br. at 58.) Marcavage further argues that "the facts of this case clearly show that Defendants' use of force on May 3, 2009 was excessive." (Appellant's Br. at 60.)

Under *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citation omitted). As we noted in *United States v. Delfin-Colina*, "only a 'minimal level of objective justification' is necessary for a *Terry* stop." 464 F.3d 392, 396 (3d Cir. 2006) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). This standard was met here. Marcavage and Gardner actually entered the Equality Forum march they were counter-protesting. This led march participants to attempt to remove Gardner from the march with physical force. With the possibility of a melee looming, the officers moved Gardner onto the sidewalk and similarly relocated Marcavage when he began to loudly protest Gardner's treatment. The stop, including the

11

struggle between Marcavage and the officers, lasted for just over one minute. The officers' conduct was both "justified at its inception," and "reasonably related in scope to the circumstances which justified the interference in the first place," as a brief stop of both Gardner and Marcavage was required under these circumstances to maintain public safety and order. *Terry*, 392 U.S. at 20.

Similarly, the force applied by the police was also reasonable. The Supreme Court observed in *United States v. Hensley*, 469 U.S. 221, 235 (1985), that police are "authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." Here, an agitated Marcavage reached for and refused to release an unknown object after having been moved to the sidewalk by police. The officers had every right to apply a reasonable amount of force until they determined the nature of the object, at which point they released Marcavage. Accordingly, Marcavage's claims under the Fourth Amendment fail.

C.

Marcavage also alleges that he was denied equal protection of the law. He notes that "[d]uring the 2008 PrideFest event . . . members of two different organizations, an animal rights group and a group soliciting signatures to put Ralph Nader on the election ballot were allowed to move freely wherever they want[ed] to go while Marcavage's movements were restricted." (Appellant's Br. at 51.) Marcavage further alleges that during both PrideFest years and the Proposition 8 demonstration, "people who were attending the events and people who were counter-demonstrating against Marcavage"

12

were given "unfettered access to public streets and sidewalks outside of the entrance to the festival while Marcavage was denied such access." (Appellant's Br. at 51.) Marcavage specifically points to an individual, James Duggan, as an example of someone "who frequently provides a counter viewpoint to Marcavage's messages and was present at both [PrideFest] events," and who was able to "mov[e] freely around." (Appellant's Br. at 51-52.) Marcavage argues that "[t]hese individuals were similarly situated to Marcavage in every way," and there was therefore "no rational basis" for the alleged "disparate treatment of Marcavage." (Appellant's Br. at 52-53.)

We disagree. None of the individuals Marcavage points to attracted agitated crowds, counter-protested the permitted event, or engaged in verbal and physical confrontations with event participants. While James Duggan, the Ralph Nader supporters, and the animal rights activists may have been "in all relevant respects alike" to each other, none of these individuals were similarly situated to Marcavage because of his status as a counter-protestor and the potential for disruption he presented. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). Accordingly, Marcavage's Fourteenth Amendment claim fails.[5]

### III.

For the foregoing reasons, we will affirm the District Court's judgment.[6]

---

[5] We do not address the alleged violations of Marcavage's rights to freedom of travel and privacy as Marcavage did not raise these issues on appeal.

[6] Though it is unnecessary for us to reach the issue of qualified immunity, we observe that even if the individual defendants had violated Marcavage's constitutional rights, qualified immunity would apply to shield them from liability for civil damages, "as their conduct does not violate clearly established statutory or constitutional rights of

13

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Similarly, municipal liability is inappropriate here because Marcavage is unable to show that "*deliberate* action attributable to the municipality itself is the 'moving force' behind [his alleged] deprivation of federal rights." *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 400 (1997) (citation omitted).