NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0472n.06

No. 17-6291

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JOHN MCGLONE; JEREMY PETERS, as individuals, | ) ) ) | **FILED**<br>Sep 19, 2018<br>DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, | ) ) ) ) | COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| Defendant-Appellee. | ) ) ) | |

BEFORE:  **BATCHELDER, MOORE, and LARSEN, Circuit Judges.**

**ALICE M. BATCHELDER, Circuit Judge**.  John McGlone and Jeremy Peters were ordered to leave a public sidewalk, or else face arrest, for preaching against homosexuality outside of an LGBTQ pride festival in downtown Nashville.  Nashville enforced this restriction against the preachers because of the anti-homosexuality content of their speech.  Because Nashville's action does not survive strict scrutiny, it violated McGlone and Peters' free speech rights protected by the First Amendment.  The district court erred in finding otherwise.  We **REVERSE**.

**I.**

Factual Background

The central facts of this litigation are not in dispute.  The Nashville Pride Festival ("Pride Festival") was held on June 26 and 27, 2015, at Public Square Park in downtown Nashville.  The stated purpose of the Pride Festival was "to celebrate the culture and community of the LGBTQ

people in Nashville in a safe space." The Pride Festival applied for and received a special events permit. As part of its application for the permit, the Pride Festival submitted a security action plan, which was completed by Comprehensive Security ("Comprehensive"), a private security company, and approved by the Metropolitan Nashville Police Department ("MNPD"). The Pride Festival provided a community-notification letter, as required by the application process, which identified MNPD Lieutenant David Corman as the contact person for any question related to security.

The Pride Festival was a ticketed event with ingress and egress areas around the perimeter of Public Square Park. The ticketed area was marked off with fencing and barricades that controlled access, but the permitted area extended beyond the fence lines and included the area central to this dispute—the sidewalk plaza near the fountains in front of Public Square Park.

McGlone and Peters believe homosexuality is sinful, and they regularly preach at public events using bullhorns and amplification equipment. Prior to the 2015 Pride Festival, Peters emailed Lt. Corman, informing him of the preachers' intent to spread their message outside of the Pride Festival on Public Square Park's sidewalks. Lt. Corman emailed back: "The organizers secured a sidewalk lane and road closure surrounding the event site, and it would appear that you need to conduct your activities on the other side of the road." Testimony from Comprehensive's owner indicates that Lt. Corman's email was forwarded to Comprehensive's security officers, putting them on notice that the preachers were to remain on the opposite side of the street.

On June 27, 2015, McGlone and Peters, along with a number of supporters who are not involved in this litigation, went to the sidewalks of Public Square Park to preach. The sidewalk area was open to the public; no one had to pay to be there. A few minutes after McGlone and

Peters began preaching, they were confronted by Josh Crowe, an off-duty police officer, employed by Comprehensive as security for the festival.

Crowe, following instructions provided by MNPD, told McGlone and Peters that they were not allowed to be in the sidewalk area and that they would be arrested if they remained. Their presence did not block people from queuing in line for the Pride Festival or force people to step into traffic. Only the preachers and those affiliated with them were told to leave. Together with their retinue, McGlone and Peters retreated to the sidewalk across the street from Public Square Park, and from that area preached for the next four to five hours. They claim that their message, communicated from across the street, was interfered with by "deflection" and the noise of passing traffic.

Procedural History

McGlone and Peters filed this action in federal court on April 14, 2016, alleging that the Metropolitan Government of Nashville and Davidson County, Tennessee ("Nashville"), violated their First Amendment rights to freedom of speech and the free exercise of religion by barring them from the Public Square Park. After discovery, McGlone and Peters filed for summary judgment, as did Nashville. The district court ruled in favor of Nashville. The preachers appealed.

**II.**

We review a district court's grant of summary judgment de novo. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Saieg v. City of Dearborn*, 641 F.3d 727, 733 (6th Cir. 2011).

**III.**

This appeal raises two issues. *First*, whether McGlone and Peters' right to free speech, protected by the First Amendment, was violated by their exclusion from Public Square Park. *Second*, whether Nashville is properly subject to municipal liability in this case.

**A.**

*McGlone and Peters' First Amendment Claim*. The right of free people to express themselves without unjustified governmental restriction is enshrined in our First Amendment. U. S. CONST. amend. I. ("Congress shall make no law . . . abridging the freedom of speech . . . ."). Under the Supreme Court's jurisprudence, the First Amendment's protection of speech applies against the states and their political subdivisions, such as Nashville. *See Gitlow v. New York*, 268 U.S. 652, 666 (1925); *see also Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938).

Three inquiries guide courts in ascertaining whether First Amendment free speech rights have been violated: (1) whether the allegedly excluded speech is protected under the First Amendment; (2) the nature of the forum in which the speech was to take place; and (3) whether the government's exclusion is justified under the requisite standard. *See Cornelius v. NAACP Legal Defense and Educ. Fund.*, 473 U.S. 788, 797 (1985); *see also Saieg*, 641 F.3d at 734-35. The parties agree that the First Amendment protects McGlone and Peters' speech and that the sidewalk area in question is a traditional public forum. The question in this case is whether Nashville's exclusion of the preachers from Public Square Park can be justified under the applicable level of constitutional scrutiny.

We review restrictions of protected speech in a traditional public forum using one of two standards. *Saieg*, 641 F.3d at 733-35. If the restriction is content based, then we apply strict scrutiny, *id.* at 734, and the restriction survives only if it is "narrowly tailored to be the least-

restrictive means available to serve a compelling government interest," *Bible Believers v. Wayne Cty*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc). If instead the restriction is a content-neutral regulation of the time, place, and manner of speech, then we evaluate it under an intermediate scrutiny standard, asking whether the restriction is "narrowly tailored to serve a significant government interest, and leave[s] open ample channels of communication." *Saieg*, 641 F.3d at 735. McGlone and Peters say our scrutiny of Nashville's actions should be strict, Nashville argues that it should be intermediate.

McGlone and Peters are right. Strict scrutiny applies because Nashville's restriction of McGlone and Peters' speech was content based. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2227 (2015).[1] On the other hand, "[g]overnment regulations of speech are content neutral if they are 'justified without reference to the content or viewpoint of the regulated speech.'" *Saieg*, 641 F.3d at 735 (quoting *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 696 (2010)).

Nashville argues that its speech restrictions were not content based because Nashville's reasons for excluding McGlone and Peters from the public sidewalk area were unrelated to the

---

[1] There is a distinction between content-based and viewpoint discrimination, but that distinction becomes salient when the speech is restricted in a non-public forum. *See Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 36, 48-49 (1983). Viewpoint discrimination is succinctly described in *Rosenberger v. Rector and Visitors of the University of Virginia*, where the Court said:

> When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

515 U.S. 819, 829 (1995) (citations omitted). The action taken against McGlone and Peters likely falls within the "viewpoint discrimination" subcategory of content discrimination, but in this case, because all agree that Public Square Park is a traditional public forum, the distinction between the two is a distinction without a difference. We refer in this opinion, therefore, only to content discrimination.

content of their speech. Nashville offers three purportedly non-content-based reasons for excluding the preachers. *First*, the preachers' message of "intolerance of homosexuality interfered with the message of the Festival." *Second*, the location of the speech "created an obstruction to ingress and egress." *Third*, the fact that McGlone and Peters' message drew crowds created a danger to public safety.

The inquiry into content neutrality can begin and end with the first purpose given. Nashville argues that the preachers' "intolerance of homosexuality" justified restricting their speech. At oral argument before the district court, Nashville explained why it was particularly the *content* of the preachers' speech that justified their exclusion:

> Your honor, I would disagree that [the preachers] didn't interfere in sort of the general sense of the term because this is a case where you have one expressive message versus another expressive message. And part of Pride's expressive message, as their president told us in his deposition, is to promote community, love and acceptance of LGBT – LGBTQ people in a safe space. And the Pride Festival is how we express that. It's no longer a safe space, which is part of the expressive message, when you have people standing there telling them they're going to hell, telling them that they're there to judge them. I mean, they can say they're preaching all they want to. It's hate speech, which is still protected under the First Amendment, *I guess*, but let's not pretend they're out there just handing out leaflets, Your Honor. It's not a safe space, which is part of the purpose of the festival, when that is in the very area where you queue.

(Emphasis added.)[2] Nashville's explanation leaves no doubt that but for the anti-homosexuality message that McGlone and Peters were advancing as they stood on the sidewalk, they would not have been excluded.

How, then, can Nashville argue that its restriction of the preachers' speech was not content based? Nashville argues that such discrimination is protected under *Sistrunk v. City of*

---

[2] Nashville's "guess" is correct. Speech deemed hateful and offensive is not only still protected by the First Amendment, it is the speech most in need of First Amendment protection. *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

*Strongsville*, 99 F.3d 194 (6th Cir. 1996), which in turn relies on the Supreme Court's decision in *Hurly v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557 (1995). But those cases are simply inapposite, and Nashville's reliance on them is misplaced. The *Hurley* decision struck down a public accommodations law that forced the South Boston Allied War Veterans Council ("Council") to include the Irish-American Gay, Lesbian and Bisexual Group of Boston ("GLIB") in its St. Patrick's Day parade. The Court reasoned that to do otherwise would essentially "require[] [the Council] to alter the expressive content of their parade." *Hurley*, 515 U.S. at 572-73. The Court held that such a result cannot be countenanced under the First Amendment because the parade organizers "ha[ve] autonomy to choose the content of [their] own message," *id*. at 573, and "when dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised," *id*. at 576. The Court noted the significant risk that an observer of the parade would mistakenly attribute GLIB's speech to the Council. *Id*. at 577. *Hurley* acknowledges that while the First Amendment shields "a speaker who takes to the street corner to express his views," it cannot be made into a sword that swings at the speech of others. *Id*. at 579. GLIB's demand to have a float in the parade would have cut into the Council's right to speak.

The same principle was at work in our decision in *Sistrunk*, where a high school student wearing a pro-Clinton pin sought to participate in a Bush-Quayle '92 campaign rally. 99 F.3d at 196. We held that a requirement that participants in the rally not express pro-Clinton '92 messages was justified because, per *Hurley*, the high school student did not have a First Amendment right to *participate* in the speech of the permit holder: "To require that the organizers include buttons and signs for Bill Clinton in the demonstration would alter the message the organizers sent to the

media and other observers, even if the holders of signs and wearers of buttons did not otherwise interfere with the pro-Bush rally." *Id.* at 199.

*Sistrunk* does not support Nashville's position for two reasons. The distinction between demanding to *participate* in another's speech and demanding merely to *speak* is a meaningful one, and the record here shows that McGlone and Peters sought only to do the latter. We see no risk that those attending the festival, or even ambling past Public Square Park, would have mistaken McGlone and Peters' preaching for the speech of the Pride Festival. Nor did the preachers "alter the message the [Pride Festival] sent to the media and other observers." *Id*. Unlike, for example, a MAGA-hatted man claiming a First Amendment right to stand behind Hillary Clinton at a campaign rally, McGlone and Peters did not insist on *entering* the Pride Festival, let alone *participating* in the Pride Festival's speech. They stood outside and expressed a contrary message. In doing so they were not attempting to participate in the Pride Festival's speech.

*Second*, *Sistrunk* concerned a permit that specifically granted the Bush-Quayle '92 Committee exclusive use of the grounds for their members and their invitees. That is not this case. While the area was permitted, the permit did not restrict access to the sidewalk to a special class of people; indeed, Nashville acknowledges that "the public was not banned from this sidewalk area." *See, e.g.*, *Parks v. Finan*, 385 F.3d 694, 698 (6th Cir. 2004).

The district court did not cite *Sistrunk* or *Hurley* in finding in favor of Nashville. Instead, the district court concluded that Nashville's exclusion of McGlone and Peters was a content-neutral regulation of the time, place, and manner of their speech. In arriving at this conclusion, the district court found it significant that:

> Lt. Corman simply stated that Plaintiff would need to preach from across the street because 'the organizers secured a sidewalk lane and road closure.' He did not say that Plaintiffs needed to be across the street because they had a different viewpoint from the event organizers. Additionally, when Crowe first told Plaintiffs to move, he said it was because

the area was permitted. As for others not being asked to move, it is undisputed that this was an area for lines to form, and for people to meet others who were either going into or leaving the Festival.

(Citations and alterations omitted.) But the superficially content-neutral justification provided by Lt. Corman and Crowe does not end our inquiry into whether there was content-based discrimination. In *Parks v. City of Columbus*, for instance, a similar purported justification did not survive a constitutional challenge: "When Officer Farr commanded Parks to move behind the barricaded area, he told Parks that the event sponsor did not want him there. The City offered no explanation as to why the sponsor wanted him removed." 395 F.3d 643, 654 (6th Cir. 2005). MNPD's saying "the organizers secured a sidewalk lane and road closure" when the preachers alone were threatened with arrest for remaining on Public Square Park's sidewalk is as unpersuasive here as it was in *Parks*.[3]

---

[3] The district court also cited *Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. 2008) to support its holding, but its reliance on *Startzell* is misplaced. *Startzell* explicitly disclaims the precise position that Nashville would have this court adopt: "It has been Philly Pride's position that because it had a city permit to conduct OutFest, it had a correlative right to exclude from the OutFest those who hold contrary, indeed antagonistic, viewpoints . . . [a]s we make clear hereafter, that is not the holding of this opinion." *Id*. at 193-94. The *Startzell* court went on to hold that the police in that case were justified in enforcing OutFest's permit by excluding protestors because, crucially, the protestors "used bullhorns and microphones in an attempt to drown out the platform speakers . . . directly addressed an OutFest attendee in a confrontational manner, and blocked access to the vendor booths." *Id*. at 199. Here, counsel for Nashville conceded at oral argument that "there was actually, interference not as in the sense of the *Startzell* case where somebody disrupted the acts on stage." *Startzell*'s facts simply do not apply in this case.

Recognizing that *Startzell*'s facts do not line up in salient respects with this case, the district court relied instead on an out-of-circuit *non*-precedent, *Marcavage v. City of Philadelphia*, 481 F. App'x 742 (3d Cir. 2012), which appears to contradict Third Circuit precedent in *Startzell*, as well as the precedent of this court.

*Marcavage* held that a permitted gay-pride festival has a right to exclude those who hold contrary and antagonistic viewpoints even absent a significant showing that the protestors were disrupting the festival's speech or blocking access for festival participants in some way. The *Marcavage* court attempted to reconcile this holding with *Startzell* with the following:

> While the disruption [the plaintiff] caused in *Startzell* may have been greater than here, this is merely a difference of degree. At each event in question Marcavage attracted agitated crowds, and during the Equality Forum one of his associates had a physical encounter with an event participant.

*Marcavage*, 481 F. App'x at 748.

Attracting agitated crowds is not a constitutionally valid reason for suppressing protected speech. *Bible Believers*, 805 F.3d at 252-53 ("When a peaceful speaker, whose message is constitutionally protected, is confronted by a hostile crowd, the state may not silence the speaker as an expedient alternative to containing or snuffing out the lawless behavior of the rioting individuals.") (citing *Watson v. City of Memphis*, 373 U.S. 526, 535-36 (1963)). Whether the

Nashville's purportedly content-neutral reasons for excluding McGlone and Peters also fail to persuade, and for similar reasons. Nashville conceded that McGlone and Peters did not deter or interfere with the Pride Festival's ability to communicate within the gated area of the festival. Indeed, at oral argument in this appeal, Nashville's counsel made a striking concession—that in counsel's view, Nashville could have properly excluded McGlone and Peters from the permitted area merely for silently wearing anti-homosexuality t-shirts.

Nashville's position is not a surprise given the position it articulated at oral argument in the court below:

> The Court: What proof's in the record that anybody who was supportive of Pride's message was deterred at all by the plaintiffs' speech?
>
> [Counsel for Nashville]: *I don't think that there is any [proof] in the record that they were deterred*, and I don't think that that is the standard. I think –
>
> The Court: Is there any proof that Pride's expressive speech was in any way hindered because of what the plaintiffs were saying?
>
> [Counsel for Nashville]: *The particular words, no.* I think the expressive –
>
> The Court: All right.
>
> [Counsel for Nashville]: I think the video itself shows that the expressive message that homosexuals should have a safe place – I think that the video is evidence that that was hindered.

(Emphasis added.) As this colloquy shows, the preachers did not "in any way hinder[]" the Pride Festival's message except by disturbing a desired "safe space" by being physically present within the permitted area—though outside the ticketed area—and vocally disagreeing with the Pride Festival's message.

---

second piece of evidence—the "physical encounter" an associate had with an event participant—is sufficient to justify the restriction in *Marcavage* is a question the panel here need not decide; there is no allegation that McGlone or Peters physically confronted anyone.

In *Parks*, the plaintiff, and only the plaintiff, was excluded from a permitted event because he peacefully engaged in speech that the event organizers disliked. 395 F.3d at 654. The *Parks* court found that exclusion content based. *Id.* As in *Parks*, "the only difference between [the preachers] and the other patrons was . . . communicat[ion of] a religious message." *See id.* at 653-54. Removal in such circumstances is "difficult to conceive" of as anything other than removal based on "the content of [the preachers'] speech."[4] *Id.* at 654.

As the record makes clear—indeed, as Nashville made explicit in the district court—Nashville's exclusion of McGlone and Peters was a content-based restriction of speech in a traditional public forum. Strict scrutiny, then, is the proper standard for our review. *Bible Believers*, 805 F.3d at 248.

Applying Strict Scrutiny

"No state action that limits protected speech will survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling government interest." *Id.* It is Nashville's burden to meet that test. *Reed*, 135 S. Ct. at 2231.

Nashville excluded McGlone and Peters from a traditional public forum for expressing a message opposed to homosexuality and Nashville provides no compelling reason for doing so. Indeed, Nashville does not even argue that its restriction of McGlone and Peters' speech could

---

[4] The dissent argues that McGlone and Peters' use of bullhorns was sufficiently disruptive to the Pride Festival's permitted activities that Nashville could exclude McGlone and Peters from Public Square Park without engaging in a content-based restriction. Dissenting Opinion, at 11-12.

The record simply does not support the conclusion that the preachers' use of amplification equipment meaningfully interfered with the Pride Festival's permitted activities—a point seemingly acknowledged by both parties to this litigation as well as the district court. At a minimum, Nashville did not meet its burden of showing that *no genuine dispute exists* as to whether the preachers' conduct interfered with the Pride Festival's permitted activities.

The only way to conclude otherwise on this record is to agree with the approach Nashville advocates: that the mere presence of individuals communicating a message, whether silently or not, contrary to the message of the Pride Festival constitutes interference with the Pride Festival's expressive message. The dissent appears to concur in our rejection of that position, but instead finds what we cannot—that there is no genuine dispute as to whether McGlone and Peters' use of bullhorns interfered with the Pride Festival's permitted activities.

survive strict scrutiny review. We therefore end our inquiry here. *See Parks*, 395 F.3d at 654 ("[B]ecause the City has not offered an interest, let alone a compelling one, to explain why it prohibited Parks from exercising his First Amendment rights in a traditional public forum . . . we need not reach the second prong of our strict scrutiny analysis."). The restriction of McGlone and Peters' speech violated the First Amendment.

**B.**

*Nashville's municipal liability*. The district court's opinion contained a footnote holding that "[t]o complete the record and for purposes of any appeal," it rejected Nashville's argument that it was not subject to municipal liability. Nashville argues that this was error.

Local governmental units can be held liable only when "action pursuant to official municipal policy of some nature causes a constitutional tort." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). The district court found that requirement satisfied on the grounds that "[n]ot only did Lt. Corman, acting on behalf of Metro, inform Plaintiffs via email that they had to preach from across the street, Comprehensive was advised of the email and it was distributed to security officers by Poteete. Moreover, the security plan was approved by [Nashville]. . . ."

We agree with the district court. As this Court held in *Bible Believers*, "with respect to a single decision, municipal liability is appropriate 'where the decisionmaker possesses final authority to establish policy with respect to the action ordered.'" 805 F.3d at 260 (citation omitted). In that case, Wayne County was held liable because its counsel drafted a letter to the Bible Believers preemptively sanctioning the decision of the police to remove the Bible Believers from the public forum. *Id.*

The question here is whether Lt. Corman, like the Wayne County counsel, possessed "final authority" with respect to the decision to bar the preachers from Public Square Park. *Id.* As noted

by the district court, Lt. Corman communicated to the preachers in advance of the Pride Festival that the event permit granted by Nashville meant that the preachers were excluded from Public Square Park. Lt. Corman was not a random police official—he had "overseen special events within [Nashville] on behalf of MNPD" "[s]ince 2010." Lt. Corman was listed as the contact person for any questions related to the security action plan in the Pride Festival's required community notification letter. It was Lt. Corman's email that directed Comprehensive's security officers to exclude McGlone and Peters from Public Square Park. Tellingly, Nashville does not contest the district court's findings regarding Lt. Corman.

Even if Nashville had done so, *Bible Believers* compels us to accept the district court's conclusion. We see no principled reason to distinguish Lt. Corman's actions in this case from those of the Wayne County counsel. If anything, this case presents an easier call as Lt. Corman had more direct authority with respect to the action ordered than did the Wayne County counsel whose duties were admittedly advisory. *Id*.

Nashville argues that McGlone and Peters cannot establish municipal liability because Nashville has no formally promulgated "policy to ask someone to leave a public forum that is being used as part of a permitted event based solely upon any speech or religious view that he or she is expressing." Further, according to Nashville, for municipal liability "there must be a pattern of unconstitutional conduct that is persistent and widespread in order to establish a policy or custom" while McGlone and Peters only allege "isolated incidents of unconstitutional conduct with regard to one special event."

Even if these underlying facts are true, they would not preclude municipal liability under this court's precedent. We found municipal liability in *Bible Believers* without finding a formally

promulgated policy or a persistent pattern of unconstitutional conduct. *Id*. The district court correctly rejected Nashville's attempt to avoid municipal liability.

## IV.

The district court's judgment granting Nashville summary judgment is **REVERSED** and **REMANDED** for proceedings consistent with this opinion.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). But governing precedent also reflects a "recognizable privacy interest in avoiding unwanted communication," *Hill v. Colorado*, 530 U.S. 703, 716 (2000), and it recognizes the corresponding legitimacy of appropriately motivated and tailored "restrictions on the time, place, or manner of protected speech," *Ward v. Rock Against Racism*, 491 U.S. 781, 797 (1989). Because I believe that it was a reasonable time, place, and manner restriction for Defendant-Appellee Metropolitan Government of Nashville and Davidson County ("Metro") to require Plaintiffs-Appellants John McGlone and Jeremy Peters ("the Preachers") to cross a downtown street if they wished to continue shouting disruptive messages through bullhorns during a permit-authorized event in a public park, I respectfully dissent.

## I. BACKGROUND

Because the majority has already explained the background of this case, I supplement its discussion of the facts only briefly here. In recent years, private organizers have held in downtown Nashville an event called "Nashville Pride" ("the Festival") as a means of celebrating Nashville's LGBTQ community. McGlone and Peters are evangelical Christian street preachers whose beliefs conflict with that message and who express their contrary views using bullhorns. This case concerns where the Preachers could stand while doing so during the 2015 Festival: on the sidewalk immediately abutting the park where the Festival was being held ("the plaza sidewalk"), or just across the street.

The Preachers' appearance at the Festival did not come as a surprise. A few days before the Festival, Peters emailed Lt. David Corman of the Metro Police Department ("MNPD"), who

had been listed as the point of contact for the Festival's security, about Peters's hope to preach on a sidewalk immediately outside one of the Festival's gates. Copying Loyd Poteete, the owner of the private company providing security for the Festival ("Comprehensive"), Lt. Corman stated in reply that "[t]he event organizers have secured a sidewalk, lane and road closure surrounding the event site" and that Peters and his group would "need to conduct [their] activities on the other side of the road." R. 60-9 (Emails) (Page ID #515). Lt. Corman later explained that he did so because he had "experience in having observed and dealt with Plaintiffs and/or members of their ministry on numerous prior occasions in which they used amplification equipment that could interfere with other sounds in the area and attracted crowds that often got confrontational with them." R. 58 (Corman Decl. at 3) (Page ID #407). Lt. Corman therefore "believed that Plaintiffs needed to conduct their activities across the street from the permitted area to allow Pride to express its message and to avoid potential disruption of the event and potential altercations with Festival patrons." *Id.* Lt. Corman further explained that "MNPD does allow expulsion from an event when an individual or group is interfering with the permit holder's expressive message, impeding ingress and egress of public thoroughfares, and creating a disturbance that threatens public safety," but that it "does not allow permit holders unfettered discretion to exclude citizens from public areas even if those public areas are permitted." *Id.* at 2–3 (Page ID #406–07).

On the day of the Festival, the Preachers nevertheless began expressing their message using bullhorns on the north side of the Union Street sidewalk—that is, on the plaza sidewalk just outside the gates of the Festival. *See* R. 54-5 (Festival Map) (Page ID #305); R. 62 (Pls.' Statement of Facts at 2) (Page ID #535). Although this area was covered by the Festival's permit, it was open

to the public, and anyone could walk through.[1] R. 60-3 (Richard Dep. at 53) (Page ID #467). Festivalgoers and other passersby began to engage with the Preachers. After a few minutes, a Comprehensive staff member named Joseph Crowe, who was also an off-duty police officer for another jurisdiction (and clad in a police uniform), told the Preachers "to please step across the street because this is private property." If they did not, he explained, they would be arrested. Video at 7:50–8:10.

The Preachers moved across Union Street. While the Preachers were on the south side of Union Street, MNPD Sgt. Brian Petty, working on-duty, approached them and explained that the plaza sidewalk from which they had just come "was like private property" and, after some prodding, stated that he would allow Comprehensive to arrest the Preachers if they began demonstrating on the Festival side of the street. Video at 18:05–18:17, 18:38–18:52. When the Preachers challenged this understanding of their rights to demonstrate on the plaza sidewalk, Sgt. Petty said that he "had to follow [his] lawful orders," *id.* at 22:11–22:14, and that he would continue to enforce his understanding of where they were allowed to be "until [he was] told something different from Metro," *id.* at 22:46–22:52.

The Preachers eventually located to a third location, on the northwest corner of Third Avenue (which seems to have been closed off) and Union Street. The Preachers continued to express their message via bullhorns from this position for at least an hour and a half. *Id.* at 34:30– 1:55:40. They engaged with at least a couple dozen Festival attendees or supporters at any given time while demonstrating in that location.

---

[1] The Festival itself, on the other hand, was ticketed. The Preachers did not buy tickets or seek to enter the Festival itself. *See, e.g.*, R. 60-9 (Emails) (Page ID #515).

## II. DISCUSSION

### A. First Amendment Framework

Courts addressing First Amendment claims begin by asking three questions: (1) whether the communication at issue "is speech protected by the First Amendment"; (2) what "the nature of the forum" is; and (3) "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). Here, Metro concedes (1) that the Preachers' speech was protected and (2) that the plaza sidewalk qualified as a public forum. This case hinges on the third question: whether, under "the requisite standard," Metro impermissibly trammeled the Preachers' free speech rights by excluding them from that particular public forum. *See id.*

Identifying the right standard hinges in large part, in turn, on whether the restriction was content based. "In a traditional public forum" like this one, "the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). Thus, if the restriction was content based, then it may be upheld only if Metro can prove that it was "necessary to serve a compelling state interest and that it [was] narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). On the other hand, if the restriction was *not* content based, then it can qualify as a permissible time, place, and manner restriction so long as it was also "narrowly tailored to serve a significant government interest, and [left] open ample alternative channels of communication."[2] *Id.* I thus begin by addressing content neutrality.

---

[2] It is therefore analytically equivalent either (a) to consider content neutrality as a threshold question for whether to apply the time-place-manner test, or (b) to treat content neutrality as the first of four conjunctive factors in the time-place-manner test. *See, e.g.*, *Perry*, 460 U.S. at 45.

## B. Content Neutrality

"Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius,* 473 U.S. at 799–800. Correlatively, governments are not required to be *blind* to content in taking such considerations into account. Rather, "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech *because of* disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (emphasis added). "The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."[3] *Id.*; *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) ("Our precedents have also recognized a . . . category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be 'justified without reference to the content of the

---

[3] While the Supreme Court has also observed that "[i]t is a familiar principle of constitutional law that [it] will not strike down an otherwise constitutional statute on the basis of an alleged illicit *legislative* motive," *United States v. O'Brien*, 391 U.S. 367, 383 (1968) (emphasis added), the Court has also been clear, more recently, that the government's motive can be decisive at least in non-legislative contexts. *See Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016) ("[T]he government's reason for demoting Heffernan is what counts here. When an employer demotes an employee out of a desire to prevent the employee from engaging in political activity that the First Amendment protects, the employee is entitled to challenge that unlawful action under the First Amendment and 42 U.S.C. § 1983—even if, as here, the employer makes a factual mistake about the employee's behavior."). And non-neutral motives can certainly prompt heightened scrutiny. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) ("[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." (citation omitted)). *See generally* Richard H. Fallon, Jr., *Constitutionally Forbidden Legislative Intent*, 130 HARV. L. REV. 523, 526 & n.15, 554–57 (2016).

regulated speech,' or that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" (alteration in original) (quoting *Ward*, 491 U.S. at 791)).[4]

In light of these principles, for example, a municipality can allowably restrict the location of adult theaters not because of "the *content* of the films shown . . . but rather [because of] the *secondary effects* of such theaters on the surrounding community." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986). That does not mean that the municipality is insensitive to the content of the regulated speech, but rather that its regulation is "*justified* without reference to the content of the regulated speech." *See id.* at 48 (quoting *Va. Pharm. Bd. v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 771 (1976)). The government may, in other words, permissibly regulate the location of certain types of speech in a way that is *correlated* with their content, so long as it is "treat[ing] [types of speech] differently [only] because they have markedly different effects upon their surroundings." *Id.* at 49 (quoting *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 82 n.6 (1976) (Powell, J., concurring)).

Some other examples help to further flesh out this permissible form of content-correlated but content-neutral regulation. A state actor can grant exclusive use of public land for a political rally. *See Sistrunk v. City of Strongsville*, 99 F.3d 194, 196–200 (6th Cir. 1996). It can, in at least some situations, regulate "the location of targeted picketing . . . under provisions that the [Supreme] Court has determined to be content neutral." *Snyder v. Phelps*, 562 U.S. 443, 457 (2011) (citing *Frisby v. Schultz,* 487 U.S. 474, 477 (1988) (upholding ban on picketing in front of a specific home); and *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 757, 768 (1994) (upholding "36-foot buffer zone on a public street" outside of abortion clinic)). And it can, our

---

[4] This exception is inapplicable "when a law is content based on its face." *Reed*, 135 S. Ct. at 2228. But that is not the case here.

cases suggest, "cordon off" protestors seeking to deliver a message contrary to a public festival, or even "disperse [an] entire crowd" that has gathered to counterprotest.[5] *See Bible Believers v. Wayne Cty.*, 805 F.3d 228, 253 (6th Cir. 2015) (en banc); *see also Collin v. Smith*, 578 F.2d 1197, 1201–02 & n.8 (7th Cir.) (discussing, in dicta, various limitations that *could* permissibly have been imposed on Nazi demonstrators in Skokie), *cert. denied*, 439 U.S. 916 (1978). In each of these examples, speech is regulated in a way that correlates with content—but that correlation is not caused by a governmental desire to help or hinder any particular type of speech or message.

Metro argues in its briefing that its restriction of the Preachers' speech here fell under this umbrella. *See* Appellant's Br. at 13–17. Based on the record, that argument is compelling. There is no evidence in the record to suggest, for example, that Metro required the Preachers to preach across the street because it disagreed with or wished to disfavor their message. Rather every indication suggests that Metro did so in order to protect the right of a permit-holder—*any* permit-holder—to hold a permit-authorized event without being subject to an unreasonable amount of interference or disruption.[6] *See* R. 58 (Corman Decl. at 3) (Page ID #407); R. 60-9 (Emails) (Page ID #515). In other words, the restriction applied to these Preachers with their message, but it also

---

[5] The counterprotesters too, in such a situation, would be regulated in a way that is correlated with the content of their speech. But the regulation again would not be motivated by any agreement or disagreement with the counterprotesters' message, but rather because of the public disorder, looming violence, or threat of a heckler's veto stemming from the counterprotesters' expression of their own message.

[6] While there is nothing in the record to tell us how deeply the disruption reached into the Festival, the video makes clear that the Preachers had at least begun to interfere in an ongoing way with people entering and exiting the Festival by the time Officer Crowe told them to move across the street. *See* Video at 3:50–6:15. It also seems all but certain from the video that the Preachers' bullhorns were loud enough that they were heard within the Festival as well. *See, e.g.*, *id.* The Preachers argue that the district court "conceded" that they did not "drown[] out the message of the Festival," Reply Br. at 15, but the page to which they cite, R. 83 (Summary J. Hr'g Tr. at 45) (Page ID #799), merely shows the district court challenging Metro's argument during a hearing. Given that the district court's written opinion does not reaffirm that sentiment from argument at the hearing—and, if anything, undercuts it, *see* R. 76 (Dist. Ct. Op. & Order at 19–20) (Page ID #714–15)—I do not construe the district court to have made any factual findings qualifying for deference on this score. (I also shudder to think what it would mean for appellate courts if every phrase a judge used to probe a litigant's legal theory during oral argument qualified as a factual finding.) And, in any event, just because someone has not *drowned another out* does not mean that they have not unduly *interfered*.

would have applied to people showing up with bullhorns to protest the Iraq War, or to glorify the Iraq War, or to say anything else loud and disruptive for an ongoing period of time.[7]  That makes the restriction "[a] regulation that serves purposes unrelated to the content of expression . . . , even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791. And therefore, because Metro's restriction was motivated by a desire to prevent serious interference with a permit-holder's authorized event rather than disagreement with the regulated party's message, the restriction qualifies as content neutral.

The Preachers have sought to avoid this conclusion by pointing to three of this court's precedents.  None, however, is sufficiently analogous.  In *Bible Believers*, for example, our court, sitting en banc, determined that local police had enforced a "heckler's veto" against speakers who had sought to express an anti-Islamic message at the Arab International Festival in Dearborn, Michigan.  805 F.3d at 255.  But that was after police failed to curtail crowd violence against the speakers and then escorted the speakers *out* of the festival—"permanently cutting off [their] speech," *id.*, in the absence of a meaningful attempt to allow them to express themselves.  *See id.*

---

[7] I hasten to emphasize the conjunctive nature of these factors.  I do not understand the First Amendment, for example, to mean that if a municipality seeks to exclude one disruptive party, for example, it must therefore—at peril of strict scrutiny—exclude all people who speak loudly, even if supportively or for merely an instant.  By way of illustration, imagine that an organization has secured a permit to hold a public memorial service for a fallen soldier in a public park.  The service includes, as many do, a series of prayers.  One citizen standing on the sidewalk just outside the park chooses to yell "Amen" at the top of his lungs at the end of each prayer for the duration of the service, while a second, temporarily moved by an unrelated frustration, makes a momentary exclamation at one point.  A third citizen on the same sidewalk, meanwhile, chooses to yell a stream of invective regarding soldiers and religion at the top of *his* lungs for the duration of the service, causing a small crowd to form and making it harder for others (especially at the periphery) to hear the service.  *Cf. Snyder*, 562 U.S. at 448–49.  I do not believe that there is any content discrimination if the police allow the first two citizens to remain while requiring the third citizen to move across the street.  Certainly, the police would be treating the third speaker differently from the other two, and the treatment would *vary with* the content.  But only the third speaker's statements are loud, disruptive, and ongoing, and there is no indication that other loud and ongoing statements that would *also* be disruptive would be treated any differently.  It is similarly true that the City of Renton treated movie theaters that chose to show children's cartoons differently from movie theaters that chose to show adult films.  *See Renton*, 475 U.S. at 44.  But only one of those two types of theaters generated the secondary effects that the City was worried about, and there was no indication that other theaters that generated the same secondary effects would have been treated any differently.  *See id.* at 47–49.

at 241, 253–55.  Indeed, what the police did in this case in Nashville sounds a lot like what our en banc court suggested *should* have been done in *Bible Believers*.  *See id.* at 253 (noting that police could have "cordon[ed] off the speakers," among other possibilities); *id.* at 254 ("But in this case, there were a number of easily identifiable measures that could have been taken short of removing the speaker: *e.g., . . .* erecting a barricade for free speech, as was requested; . . . or allowing the Bible Believers to speak from the already constructed barricade to which they were eventually secluded prior to being ejected from the Festival.").  Just as our en banc court suggested that those options were permissible, content-neutral options in *Bible Believers* (even though they too would have been correlated with the speakers' content), requiring the Preachers to cross the street before continuing to shout from their bullhorns appears content neutral in light of the record here too.

The Preachers have also sought to rely on *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005), and *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011), but those analogies likewise fail to fit this case.  *Saieg*, a case involving a leafleting prohibition (also, like *Bible Believers*, at Dearborn's Arab International Festival), 641 F.3d at 729, especially fails to fit on content neutrality, because we found in *Saieg* that the leafleting restriction at issue *was* content neutral, *id.* at 735.  In *Parks*, by contrast, we did find that a city's exclusion of the plaintiff from a public arts festival was content based, but we did so in the context of a "peaceful" leafleter, 395 F.3d at 653, who was excluded despite the fact that the arts festival that had no discernible "collective message" (and certainly not one that Parks was interfering with), *id.* at 651, and where "[t]he City offered no explanation as to why the sponsor wanted him removed," *id.* at 654.  Indeed, as Metro points out, Appellee's Br. at 26, we specifically distinguished the issue presented by *Parks* from a case in which "the speaker attempted to interfere with the expressive message conveyed by the permit-holder."  *Id.* at 649.  In short, *Parks* did not involve the same

considerations—loud and ongoing pronouncements from a bullhorn that threaten to disrupt or interfere with permit-authorized activities—that could have permissibly motivated Metro here. *See id.* at 653–54; *see also Startzell v. City of Phila.*, 533 F.3d 183, 199 (3d Cir. 2008) (distinguishing a case much like this one from the situation in *Parks*).

What these cases make clear, instead, is that a permit-holder cannot use the law to exclude somewhat more modest forms of purported interference—for example, "peaceful" leafleters—from public fora. *See, e.g.*, *Parks*, 395 F.3d at 653. But there is no indication in the record that Metro sought to restrict those kinds of less disruptive speakers. *See* R. 58 (Corman Decl. at 2–3) (Page ID #406–07) (explaining that "MNPD does *not* allow permit holders unfettered discretion to exclude citizens from public areas even if those public areas are permitted," but that it "does allow expulsion from an event when an individual or group is interfering with the permit holder's expressive message, impeding ingress and egress of public thoroughfares, and creating a disturbance that threatens public safety" (emphasis added)). Had the Preachers here simply sought to carry signs, wear tee shirts, or pass out leaflets on the plaza sidewalk, this would be a very different case. But that is not the expression at issue, and the Preachers have not introduced any evidence to contradict the record evidence suggesting that Metro would have allowed them to demonstrate in such less disruptive manners. Here, instead, the Preachers brought bullhorns—and, by extension, disruption and interference—directly to the entrance and exit gates. Metro could permissibly require the Preachers to cross the street without qualifying as having imposed a content-based restriction.

* * *

If the record and the parties' written submissions were all that our court had to go on, I would conclude easily that the foregoing establishes that Metro's restrictions were content neutral

for purposes of summary judgment. But the governing standard, of course, is that we must allow summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Saieg*, 641 F.3d at 733 (quoting FED. R. CIV. P. 56(a)). Statements made by Metro's appellate counsel at oral argument, meanwhile, conceivably undercut what the record itself otherwise indicates.

This problem arose when our panel began asking Metro's appellate counsel about various hypotheticals to try to understand Metro's theory of the case. The following exchange occurred[8]

| Court: | Could the Preachers have stood on the sidewalk and handed out leaflets there? |
|---|---|
| Appellee: | I believe, your honor, that is a closer case. I believe if those leaflets said similar to— |
| Court: | Similar to their message. |
| Appellee: | If it weren't specifically an undermining, competing message of the Festival. |
| Court: | So wait a minute, are you saying . . . if I'm an Episcopalian minister, and I want to stand there, and I want to say, "God loves all people, we believe in gay marriage, come to my church and get married"— that person would be allowed to stay and preach his vision of the Gospel and a preacher who comes in and says, "Homosexuality is a sin," they're not allowed? That's the State's position? |
| Appellee: | Our position is that if there's a discordant message . . . to the underlying expressive message, then yes, those people can be limited in exactly where they stand. I want to be clear— |
| Court: | But you would allow the Episcopalian minister in my hypothetical to stand right there, . . . have a bullhorn [and say], "Come to our church, get married, we'll perform your wedding tomorrow," but not the people with a message contrary to that—a different vision of Christianity? Because I'm thinking that's not just content discriminatory, but viewpoint discriminatory, and that seems tough . . . |
| Appellee: | And I would say, your honor, that, again, it's the context of the permit. And in that situation, if there were bullhorns and if people |

---

[8] I have transcribed this exchange in full given its relevance to the central question of content neutrality.

were gathering around and people couldn't get in and there were ingress and egress being blocked, and I would submit that—

Court:    But couldn't there be ingress and egress being blocked by my Episcopalian minister who's saying, "Come, free weddings tomorrow, we're going to waive our fees, come sign up, we're scheduling people," and everybody's coming, they're like "Great, I want to marry my partner"—that person can stay and block all they want, but—

Appellee: And I don't think I articulated myself very well.  No, that person cannot stay and block all they want.  If someone is there with leaflets that say "Love Jesus," I think they should be allowed to stay there.  I think once you're talking about bullhorns and gathering of people and people not being able to line up—and I would submit that in the video in this case, while the district judge did say that it seemed like people could get around, I mean they could get around, but there was a big crowd and you had to do some maneuvering to get around . . .

Court:    So the key really to your position is the use of the bullhorns and causing a crowd to form and that that would apply no matter what the message of the bullhorns would be?

Appellee: I think that is the first prong of our message.  And then the second prong is that this case, the case of *Sistrunk*, is really the most on-point case in the Sixth Circuit, even though it was a political-rally case, that says a group that gets a permit has a right to exclusive control of an area to express their message.  And this certainly was a discordant view to that message and undermined the entire expressive message of the festival, which was that this traditionally marginalized group of society could come and celebrate being who they are.

Court:    Is it the bullhorns that are the problem?  So if I stood out there, and I said, "Sign up for my low-interest-rate credit card and I'll give you a free tee shirt," and everybody's like great, I want the free tee shirt and the credit card, and I've got my bullhorn, and it's loud, and I'm attracting a crowd, and maybe you can't hear back in the Festival— although there's no indication here that this message was blocking out speakers inside.  Can I stand there and advertise my credit card? "Come, everybody is welcome, I welcome all people to apply for my credit card, and I'll give you a tee shirt"?

Appellee: I don't think once you start attracting a crowd and making an issue with ingress and egress to the Festival, you would be allowed to stand there.  That's a different case than here, there are noise ordinances—which is not at issue in this case—but things like that that could come into play.

Court:       So it's not the bullhorn . . . it's the crowd that's the problem? It's not the bullhorn. If I stood out there with my bullhorn and said, "It's raining today, it's raining today, it's raining today," and the sun is shining, everybody would just ignore me and think I was a crazy person and walk by. So it's not the bullhorn—it's the crowd forming? And that goes to time place and manner? I just am trying to get a handle on it.

Appellee:    It's three things. First, it's that Nashville Pride had a permit for exclusive use of this area to promote their message. And under *Sistrunk*, they could exclude discordant speakers. It's also, on the realities of *this* case—if you just sort of want to get away from the academic law, because First Amendment cases have to be fact specific in a lot of instances—you also not only have a message that undercuts Pride's expressive message, you have it through amplification equipment. And you have it through incendiary language that is broadcast very loudly in a group that is quite frankly, if you watch the video, I submit designed to draw an incendiary crowd. You have it happening at an area that has been set up, part of the permitted festival, to allow people to not have to line up in the street, and if you watch the video, minute five, I mean the people that engage with the Appellees [sic] are people who are in line to go to this Festival, so I would submit that they were at least distracted from their expressive purpose by the Appellees [sic] in this case. At the end of the day . . .

Court:       So distraction is enough?

Appellee:    No, your honor, certainly not. But this notion that people were just standing around doing nothing and that there's no indication that they were actually people participating or wanting to participate in the Festival I think is belied by the video.

Oral Arg. at 20:19–26:17.

There are several problems with Metro's arguments here. For one, they noticeably overstate the applicability of a case like *Sistrunk* to the situation here. In *Sistrunk*, we ruled that a municipality could grant a permit to a political campaign (there, the Bush-Quayle '92 campaign) "seeking to make exclusive use of" an otherwise traditional public forum "for expressive activity during a limited period of time," 99 F.3d at 198, and that the campaign could in turn exclude an individual seeking to communicate a contrary message (tacitly, by wearing a pro-Clinton button), *see id.* at 199. But even assuming that *Sistrunk* is still good law—an issue not implicated directly

by this case—there is no debating that *Sistrunk* merely allowed the exclusion of a plaintiff who attempted to communicate a contrary message *within* a temporarily nonpublic forum. *See id.* at 198–99. Indeed, we made clear in *Sistrunk* that "[t]he plaintiff could have stood with her button on the sidewalk leading up to the rally to express her support for Clinton," *id.* at 199—a statement that, though dicta, should eliminate any question that the Preachers here could not have been removed from the still-public forum of the plaza sidewalks simply for wearing buttons or tee shirts, or carrying placards, or handing out leaflets espousing their contrary message. The true question here, distinct from that of *Sistrunk*, is whether the Preachers were permissibly forced to cross the street for communicating their message *with bullhorns*—and all the additional disruption and interference that bullhorns entail.

Second, and more centrally, Metro's argument potentially raises a question about Metro's true purpose. As noted above, when it comes to content neutrality, "[t]he government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791. And while inquiring into a given government actor (or institution's) purpose may be thorny in some cases, the Supreme Court has been clear that "scrutinizing purpose does make practical sense . . . where an understanding of official objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." *McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 862 (2005). Here, appellate counsel seemed to suggest at one point that Metro would limit any speaker with a "discordant message," but not others engaged in similar non-"discordant" speech. *See* Oral Arg. at 20:35–21:25. If accurate and cognizable, that statement would at least create a genuine issue of material fact that Metro *is* in fact regulating speech based on the content of that speech, rather than based on other effects that are independent of (but correlated with) the content of that speech.

Ultimately, however, I do not believe that these statements render summary judgment inappropriate. For one, it is not clear to me that Metro's statements were in fact intended to be a concession to such a legally indefensible position. As Judge Batchelder has argued in a different case, it is questionable at best to interpret as an explicit concession the statements made when an "obviously harried attorney attempts to explain his position." *Haus v. Bechtel Jacobs Co., LLC*, 491 F.3d 557, 571 (6th Cir. 2007) (Batchelder, J., dissenting). On my read of the transcribed language above, counsel at several junctures attempted to clarify what seem to have simply been unartfully worded answers to questions concerning a notoriously thorny area of legal doctrine. *See* Oral Arg. at 21:24–21:27 ("I want to be clear . . ."); *id.* at 22:06–22:12 ("And in that situation, if there were bullhorns and if people were gathering around and people couldn't get in and there were ingress and egress being blocked . . ."); *id.* at 22:36–22:49 ("And I don't think I articulated myself very well. No, that person cannot stay and block all they want. If someone is there with leaflets that say 'Love Jesus,' I think they should be allowed to stay there. I think once you're talking about bullhorns and gathering of people and people not being able to line up . . ."); *id.* at 24:22–24:29 ("I don't think once you start attracting a crowd and making an issue with ingress and egress to the Festival, you would be allowed to stand there."); *id.* 26:06–26:08 ("No, your honor, certainly [distraction is] not [enough]."). In short, I do not believe this is a situation in which counsel has in fact "succinctly and unequivocally admitted" what it might sound like counsel admitted. *See Haus*, 491 F.3d at 571 (Batchelder, J., dissenting). I think it is much more likely that counsel simply misspoke.

Moreover, as Judge Batchelder has also explained:

[T]he very most that the majority can offer is that [Metro's] *appellate* counsel was equivocal on the matter. But, this is not evidence. In fact, there is no evidence in the record—admissible or otherwise—to support this contention; there is no Rule

> 36 admission, no interrogatory answer, no stipulation, no deposition testimony, no trial testimony . . . nothing . . . .

*Id.* at 572. This observation accords with the approach that both we and other circuits have taken. *See Esch v. Cty. of Kent*, 699 F. App'x 509, 514 n.2 (6th Cir. 2017) ("And of course, representations made during oral argument are not part of the record, and are generally not sufficient to support a motion for summary judgment." (citing *EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins. Co.*, 257 F.3d 992, 999 (9th Cir. 2001); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308 n.4 (11th Cir. 1998); CHARLES A. WRIGHT & ARTHUR R. MILLER ET AL., FEDERAL PRACTICE & PROCEDURE § 2723 n.2 (4th ed. Supp. 2017))). "Accordingly," particularly in light of the ambiguity of counsel's statements during rapid-fire questioning, in my view we ought "not consider [Metro's] oral argument statements in adjudicating this appeal." *See Esch*, 699 F. App'x at 514 n.2. I therefore continue to believe that the restriction at issue here was content neutral and thus proceed to the rest of the time, place, and manner test.

## C. Significance of the Government Interest

"A valid time, place, and manner regulation must also 'serve a significant governmental interest.'" *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) (quoting *Va. Pharm. Bd.,* 425 U.S. at 771). "[C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Id.* at 650–51; *see also Hill v. Colorado*, 530 U.S. 703, 716 (2000) ("The recognizable privacy interest in avoiding unwanted communication varies widely in different settings."). In *Heffron*, for example, the Supreme Court distinguished the Minnesota fairgrounds from a normal public street, noting that "[t]he flow of the crowd and demands of safety are more pressing in the context of the Fair," *id.* at 651, and concluding that the state accordingly had a substantial-enough interest

"in confining distribution, selling, and fund solicitation activities to fixed locations," *id.* at 654. The Court noted that the interest was especially significant in light of the fact that not only the plaintiffs but also "all other organizations . . . would be entitled to distribute, sell, or solicit if the booth rule [could] not be enforced with respect to [the plaintiffs]," and that the resulting flood of solicitors could well overrun the fair and prevent the state from "managing the flow of the crowd." *Id.* at 654.

Metro appears to characterize its governmental interest here much the same way that the Third Circuit characterized the City of Philadelphia's interest in *Startzell*:

> The City has an interest in ensuring that a permit-holder can use the permit for the purpose for which it was obtained. This interest necessarily includes the right of police officers to prevent counter-protestors from disrupting or interfering with the message of the permit-holder. Thus, when protestors move from distributing literature and wearing signs to disruption of the permitted activities, the existence of a permit tilts the balance in favor of the permit-holders.

*Startzell*, 533 F.3d at 198–99; *see* Appellee's Br. at 26–27 (quoting this language from *Startzell*); *see also* R. 58 (Corman Decl. at 3) (Page ID #407) (explaining that Lt. Corman "believed that Plaintiffs needed to conduct their activities across the street from the permitted area to allow Pride to express its message and to avoid potential disruption of the event and potential altercations with Festival patrons"). Understood this way, and considering the (temporary) "special attributes" and "characteristic nature and function of the" public land covered by the Festival's permit, *Heffron*, 452 U.S. at 650–51, the interest asserted by Metro qualifies as a sufficiently significant interest for two main reasons.

First, while the permit did not divest the plaza sidewalk of its status as a public forum, *see, e.g.*, *Parks*, 395 F.3d at 648, it did change the nature of that public forum in the specific context of the time-limited event covered by the permit. It was not, for that brief window of time, "a continually open, often uncongested . . . place where people [could] enjoy the open air or the

company of friends and neighbors in a relaxed environment," but part of "a temporary event attracting great numbers of visitors who c[a]me to the event for a short period" to align themselves with a particular message. *See Heffron*, 452 U.S. at 651. In that context, there was an interest in ensuring that the temporary event was able to proceed as planned that would not apply on a normal street corner. And that interest is, as in *Heffron*, greater given the need for neutral administrability. After all, if the Preachers' group of eight-to-ten evangelists, *see* Video at 2:09:05–2:09:22, were allowed to plant themselves at the entrance gate and begin preaching their message via bullhorns, it is not clear on what grounds other groups equally interested in disrupting the Festival (or merely shouting their own, unrelated disruptive messages) could have been excluded. *See Heffron*, 452 U.S. at 654.

More importantly, however, the *means* of speech employed by the Preachers differs sharply from the peaceful solicitation involved in cases like *Heffron*, *Parks*, and *Saieg*. Whereas those plaintiffs brought conversation-level voices and pieces of paper, the plaintiffs here brought bullhorns. That their message was offensive to listeners does not rob it of protection, "[b]ut the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it." *Hill*, 530 U.S. at 716. "Even in a public forum," as the Supreme Court has explained, "one of the reasons we tolerate a protester's right to wear a jacket expressing his opposition to government policy in vulgar language is because offended viewers can 'effectively avoid further bombardment of their sensibilities simply by averting their eyes.'" *Id.* (quoting *Cohen v. California,* 403 U.S. 15, 21 (1971)). Thus, whereas society might well have to tolerate a peaceful but offensive leafleter "when 'strolling through Central Park,' . . . the interest in preserving tranquility in 'the Sheep Meadow' portion of Central Park may at times justify official restraints on offensive musical expression" there. *Id.* (first

quoting *Cohen*, 403 U.S. at 21; then quoting *Ward,* 491 U.S. at 784).[9] The interest in allowing a permit-holder to hold its authorized event without being seriously disrupted (if not drowned out) is significant enough, too, to justify reasonable restraints on the location of speakers who cause ongoing disruption or interference.[10] *See Startzell*, 533 F.3d at 197 ("The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy." (quoting *Cox v. Louisiana*, 379 U.S. 536, 554 (1965))); *cf. Madsen*, 512 U.S. at 772–73 ("The First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests.").

This readily apparent interest in the facts of *this* case, *see, e.g.*, R. 57 (Crowe Decl. at 1–2) (Page ID #400–01); R. 58 (Corman Decl. at 3) (Page ID #407); R. 60-9 (Emails) (Page ID #515), distinguishes it from a case like *Saieg*, on which the Preachers seek to rely, Appellants' Br. at 29–30. There, we ruled that Dearborn's leafleting restrictions on the inner perimeter of its festival did "not further a substantial governmental interest" not because they *could* not, 641 F.3d at 736 ("In appropriate contexts, each of these governmental interests can be substantial."), but rather because

---

[9] *See also Hill*, 530 U.S. at 716–17 ("The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases. It is an aspect of the broader 'right to be let alone' that one of our wisest Justices characterized as 'the most comprehensive of rights and the right most valued by civilized men.' The right to avoid unwelcome speech has special force in the privacy of the home and its immediate surroundings, but can also be protected in confrontational settings." (citations omitted) (quoting *Olmstead v. United States,* 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting))); *id.* at 724 (upholding buffer law prohibiting certain types of speech surrounding medical facilities on the grounds that "the statute's restriction seeks to protect those who enter a health care facility from the harassment, the nuisance, the persistent importuning, the following, the dogging, and the implied threat of physical touching that can accompany an unwelcome approach within eight feet of a patient by a person wishing to argue vociferously face-to-face").

[10] Much as noted above, of course, a government cannot justify restricting speech in order to prevent the occasional minor or ephemeral disruption. *See, e.g.*, *Saieg*, 641 F.3d at 738; *Parks*, 395 F.3d at 654. But that does not mean that it lacks a valid interest in mitigating major and ongoing interference. *Cf. Parks*, 395 F.3d at 649 (distinguishing the *Parks* case from "circumstances where the speaker attempted to interfere with the expressive message conveyed by the permit-holder").

"the interests that the defendants ha[d] named [we]re merely 'conjectural' as opposed to 'real,'" *id.* at 737 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994)). For one, we explained, "the defendants ha[d] chosen to keep the sidewalks open for public use, showing that the interests in crowd control and public safety [we]re not so pressing that they justif[ied] restricting normal activity that occurs on streets and sidewalks." *Id.* at 737. "Second and more importantly," we added, the organizers had also allowed "sidewalk vendors" on the relevant sidewalks, further "belying the significance of their interest in clear sidewalks and crowd control." *Id.* It thus did not wash for the defendants to claim that leafleting was a major concern, given that "[l]eafleting is *less* obtrusive than sidewalk tables are." *Id.* As we observed, "the government's interest may still be insubstantial if the regulation burdens substantially *less* speech than is necessary to further the government's interest." *Id.* at 738.

No such arguments apply here. There is no indication, for example, that Metro allowed other loud, disruptive speakers—or, indeed, anyone or anything else that would have disrupted the permit-authorized event—on the sidewalk just outside the Festival gates. Rather, based on his "experience in having observed and dealt with Plaintiffs and/or members of their ministry on numerous prior occasions in which they used amplification equipment," Corman anticipated the likelihood of "interfere[nce]" and "potential disruption of the event" and communicated the restriction accordingly. R. 58 (Corman Decl. at 3) (Page ID #407). When that danger in fact manifested, others reiterated the restriction. *See, e.g.*, R. 57 (Crowe Decl. at 1–2) (Page ID #400–01).

The Preachers argue, meanwhile, that the case is like *Saieg* because "no one who was not in line to buy tickets was asked to leave except McGlone and Peters and those with them," and "there were sponsor tents in the permitted area as well." Appellants' Br. at 28–29. But that misses

the point. In contrast to *Saieg*, no one else on the sidewalk area at issue served to endanger the interest that Metro asserts—no one, for example, brought bullhorns that began to disrupt parts of the Festival. True, the Preachers did not necessarily disrupt entry and exit from the Festival from a *safety* perspective—there is evidence that "there was enough room for people to get around without dangerously stepping out in traffic." R. 54-7 (Petty Dep. at 30) (Page ID #317). But that just means that one interest (in pedestrian safety) was, at least for purposes of summary judgment, insufficient to justify the restriction; it does not mean that Metro's interest in preventing *disruption* was not at stake. And indeed, the record discloses no evidence that Metro ignored any comparable threats of disruption to the event the way that the municipality in *Saieg* ignored comparable threats to sidewalk density; it instead reveals sincere concern regarding the disruption that these speakers—like any speakers with their own, separate agenda[11] armed with bullhorns—could cause. *See, e.g.*, R. 58 (Corman Decl. at 3) (Page ID #407); R. 60-9 (Emails) (Page ID #515). In the context of a permit-authorized, time-limited, expressive event on public property, and in light of the particular dangers of disruption posed by a group of speakers with a separate agenda using bullhorns, I would deem Metro's interest in requiring the Preachers to demonstrate across the street "sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest." *See Heffron*, 452 U.S. at 654.

---

[11] That is, any speakers whose interests are completely independent of the Festival's. That could mean speakers who are adverse to the Festival's message, but it would also encompass speakers—like the hypothetical credit-card hawker that our panel raised at oral argument, *see* Oral Arg. at 23:42–24:22—whose messages are simply oblique. Just as it can be (for reasons discussed above) content neutral to treat such speakers differently than speakers involved in permit-authorized activity, doing so in order to allow a permit-authorized event to go forward without major disruption can reflect a significant government interest. *See Saieg*, 641 F.3d at 736; *cf. Parks*, 395 F.3d at 649. And there is no indication here that Metro allowed other, unaffiliated speakers like the hypothetical credit-card hawker to show up and interfere with the Festival.

**D. Narrow Tailoring**

That brings us to narrow tailoring. The Supreme Court has emphasized "that restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" *Ward*, 491 U.S. at 797 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). In other words, "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but . . . it need not be the least restrictive or least intrusive means of doing so." *Id.* at 798. "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 799 (quoting *Albertini*, 472 U.S. at 689).

Here, Metro's interest in allowing a permit-authorized event to use the permit-covered area without serious disruption would have been "achieved less effectively absent the regulation." *Id.* (quoting *Albertini*, 472 U.S. at 689). While requiring the Preachers to cross the street did not silence the Preachers or prevent them from communicating their message to a large number of attendees, *see* Video at 34:30–1:55:40, it did shift their bullhorn-amplified communication—and the commotion attending it—a short ways away from where other attendees were simply trying to purchase tickets, enter the Festival, or engage with the Festival's message. This limited restriction—requiring the Preachers to cross the street (which, at least where the Preachers settled, was closed off anyway, eliminating any noise deflection from passing cars)—qualifies as narrowly tailored.[12]

---

[12] To be clear, had Metro shifted the Preachers multiple blocks over, this case would likely come out differently, whether on this prong, on the ample alternative channels prong, or on heckler's veto grounds. *Cf. Bible Believers*, 805 F.3d at 234, 241, 255 (finding an unconstitutional heckler's veto where speakers were wholly "silence[d]" and "expel[led]" from the festival altogether, such that their speech was "permanently cut[] off"). But

*Saieg*, on which the Preachers rely, Appellants' Br. at 30–33, is again inapposite. There, we ruled that leafletting provisions on the *outer* perimeter of the Arab International Festival were "substantially broader than necessary to further the government's [asserted] interests" in crowd control. *Saieg*, 641 F.3d at 740. In reaching this conclusion, we emphasized that while "the primary justification for the outer perimeter [restriction] [wa]s to curb vehicular traffic and provide parking, not to cabin pedestrian crowds," there was no indication of "any existing problem of pedestrian traffic in the outer perimeter area," nor was any danger of one posed by Saieg, who had hoped to "leaflet[] by foot." *Id.* "[T]he restriction," we explained, was therefore "not narrowly tailored because there [wa]s 'an insufficient nexus' between the government's asserted interest and the leafleting restriction." *Id.* (quoting *United States v. Grace,* 461 U.S. 171, 181 (1983)).

As should be apparent, however, the asserted interest here is distinct from—and more credible than—the one asserted in *Saieg*, and there *is* a clear nexus between that interest and the restriction.[13] Furthermore, we made clear in *Saieg* that allowing people like Saieg to leaflet peacefully did not entail blanket permission for all other conceivable activity in the same place. *See Saieg*, 641 F.3d at 740 ("[P]ermitting everyone to leaflet in the outer perimeter area does not require the city to permit street vending or other attractions in the area defined by the outer perimeter."). In short, Metro's imposing a roadway's distance between the Festival and the

---

the simple fact that the Preachers were forced to move from the area covered by the permit does not render Metro's restriction an overly broad exclusion.

[13] The Preachers argue that the restriction here swept much further—that it was geared toward "creat[ing] a 'safe space' free of any opposition to [the Festival's] message." Appellants' Br. at 33–34. But they offer no evidence for that proposition aside from one questionable phrase from oral arguments at summary judgment below. *See id.* at 33 (quoting R. 83 (Summary J. Tr. at 48–49) (Page ID #802–03)). As already discussed, however, we do not generally treat statements made at oral argument as evidence, *see Esch*, 699 F. App'x at 514 n.2, and, moreover, there is no evidence that Metro sought to move more passive protestors, such as leafleters, people carrying signs, or people wearing shirts espousing contrary messages.

Preachers' bullhorn-amplified protest was a narrowly tailored means of serving Metro's legitimate interest in allowing the permit-authorized activity to proceed without major disruption.

**E. Ample Alternative Channels of Communication**

The final prong in the time, place, and manner analysis is the availability of sufficient alternative channels of communication. "Any time, place, and manner restriction must leave open ample alternative channels by which speakers can communicate their messages." *Saieg*, 641 F.3d at 740. "An alternative is not ample if the speaker is not permitted to reach the intended audience." *Id.* (quoting *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990)). On the other hand, "speakers are 'not entitled to [their] best means of communication.'" *Id.* (alteration in original) (quoting *Phelps-Roper v. Strickland*, 539 F.3d 356, 372 (6th Cir. 2008)).

Metro can easily satisfy this prong. A brief review of the video provides the clearest evidence that the Preachers' alternative location—situated on a busy corner just across a closed-off street from the Festival's gates—was more than adequate to permit them to communicate their message to Festival attendees. *See* Video at 34:30–1:55:40. Indeed, the Preachers appear to have been able to engage at any given time with at least two dozen attendees or supporters of the Festival, if not more—not to mention the plenty of others who must have heard their bullhorns across the street or through the Festival's chain-link fence. The Preachers resist this conclusion by arguing that "their message could not be heard as well from the location on the other side of the street," Appellants' Br. at 35, but that argument is squarely foreclosed by Supreme Court precedent as insufficient. *See Ward,* 491 U.S. at 802 ("That the city's limitations on volume may reduce to some degree the potential audience for respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate."). That the Preachers wanted a bigger channel of communication does not mean that they were denied

constitutionally adequate channels of communication. *Saieg*, 641 F.3d at 740. And the video makes clear that the channels that remained were sufficiently robust.

### III. CONCLUSION

The First Amendment requires individuals and groups to tolerate the expression of many views with which they disagree, but it does not require anarchy. In this case, a municipality sought to regulate the position of a group of continuously disruptive speakers with bullhorns in order to prevent that group from interfering significantly with another group, which had secured a permit enabling it to use public land for its own expressive purpose. The municipality regulated the first group's position in a way that did not silence them or seriously curtail their communication; it simply required them to cross the street. Though I share the majority's solicitude for the First Amendment, I do not understand the First Amendment to prohibit such a reasonable regulation of time, place, and manner. I respectfully dissent.